## MILES v. NEW SOUTH BUILDING & LOAN ASS'N.

(Circuit Court, E. D. Louisiana.    March 21, 1900.)

### No. 12,810.

1. BUILDING AND LOAN ASSOCIATIONS—PROCEEDINGS IN INSOLVENCY—SETTLE-
    MENTS WITH BORROWING STOCKHOLDERS.

    In winding up the affairs of an insolvent building and loan association
    in a court of equity, where there are a large number of borrowing stock-
    holders, it is proper and advisable, in the interest of an economical ad-
    ministration, and to facilitate settlements without litigation, that the re-
    ceiver should be authorized in limine to make a uniform allowance to
    such stockholders as a credit on their indebtedness in settlement, based
    on the probable dividends which will accrue to their stock in the final
    distribution, where it is possible to make such allowance without endan-
    gering the rights of other parties in interest.

2. SAME—SEPARATE CLASSES OF STOCKHOLDERS—CREATION OF SEPARATE FUNDS.

    The charter of a building and loan association provided for the division
    of its capital stock into two general classes, one consisting of a certain
    number of shares to be known as "Guarantee Stock," and the remainder
    to be known as "Series Stock." The guarantee stock was to be fully
    paid when issued. It also provided that the association should keep two
    wholly distinct and separate funds, one to be known as the "Guarantee
    Stock and Expense Fund," which should belong and be attributed to the
    guarantee stock, and the other as the "Series Stock Fund," which
    should belong to the series stock. It designated the items from which
    each fund should be made up, and the purposes to which it should be
    devoted, and provided that neither should have any part in or participate
    in the other, except in relation to the money provided for expenses
    which was all to be paid into the guarantee and expense fund, while ex-
    penses were to be paid from such fund. The distinction between the
    two funds was always maintained, and they were kept separate by the
    association during all the time it was a going concern. *Held* that, in
    proceedings to wind up the association in insolvency, neither class of
    stockholders had any right or interest in the fund so expressly appropri-
    ated to the other, or in the assets belonging to such fund.

3. SAME—ADJUSTMENT BY RECEIVER WITH BORROWING STOCKHOLDERS—SECUR-
    ITIES PLEDGED TO SECURE BONDS.

    A building and loan association issued and sold bonds secured by the
    hypothecation of securities, consisting of the bonds and mortgages of its
    borrowing stockholders, with a trustee, under an agreement which per-
    mitted it to withdraw any such security by depositing in its stead $100 in
    cash for each $125 in face value of such security. Proceedings were
    instituted to wind up the association in insolvency, and a receiver was
    appointed, who was also appointed receiver in ancillary proceedings in
    other jurisdictions. In one of such ancillary suits the court, having
    jurisdiction of the trustee, ordered it to turn over the securities held to
    the receiver for collection, but without prejudice to its rights, and the
    receiver was directed to deposit the proceeds of all such collections with
    the trustee pending the final adjustment of the rights of the parties in
    interest. *Held*, that the court of primary jurisdiction, in order to enable
    the receiver, in making amicable settlements with borrowing stockhold-
    ers, to allow them a uniform credit on their indebtedness, to be consid-
    ered as an advance payment on account of dividends to accrue on their
    stock, would authorize him to exercise the right given the association
    under the trust agreement, by depositing with the trustee the amount
    received under such settlement from a borrower whose security was
    pledged, together with such additional amount in cash from the general
    funds in his hands as would make the deposit equal to $100 for each
    $125 of such security surrendered; it appearing that the assets of the
    association were ample to pay all outside creditors.

**4. SAME—ALLOWANCE OF ESTIMATED VALUE OF STOCK.**

The existence of unsecured creditors of an insolvent building and loan association does not affect the right of a receiver to make such settlement with borrowing stockholders as may be approved by the court, the court having the same right to authorize such adjustment and settlement of indebtedness due the association as the association itself would have had if a going concern.

**5. SAME—USURY—LAW GOVERNING CONTRACTS.**

Where the charter of a building and loan association and all its contracts with borrowing stockholders provide that such contracts shall be payable at the home office of the association, and shall be governed by the laws of the state in which the association is incorporated, they will not be held usurious, if valid under the laws of such state, although the stockholders may reside in other states, and their loans be secured by mortgages on property there situated.

**6. SAME—INSOLVENCY—STATEMENT OF ACCOUNTS WITH BORROWING STOCKHOLDERS.**

In a settlement between the receiver for an insolvent building and loan association and a borrowing stockholder, the latter should be charged, *in addition to the amount borrowed*, with all installments due upon his stock, all interest and premiums due on his loan, and all insurance, taxes, and other expenses due and equitably chargeable to him up to the time of the appointment of the receiver, against which he is entitled to credit for all payments made and for the amount of his distributive share of the assets of the association, when ascertained, or, when authorized by the court, he may be given credit in the settlement with the estimated value of such share, subject to readjustment on the final settlement of the estate.

The following is the report of Hon. E. B. KRUTTSCHNITT, Special Master in Chancery:

To the Honorable the Judges of said Court: By order signed in this cause on the 31st day of October, 1899, the court appointed the undersigned special master in chancery in this cause, and referred to him the petition of the receiver filed on the 25th day of October, 1899, with directions and authority, after due notice to all parties to this cause, to take testimony and report fully to the court as to the subject-matter of said petition, and specially to ascertain and report what would be a proper basis for the adjustment, settlement, and collection at this stage of the cause of the obligations of the borrowing members of the defendant, the New South Building & Loan Association; said master being required to include in his report both his findings of fact and his conclusions of law in the premises, and to accompany his report with the evidence, oral and documentary, upon which the same is based. The order further provided that, as it is desirable that the collection of debts due the association shall proceed without avoidable delay, the master is directed to make his investigation and report with all convenient speed. After notice duly extended to all parties to the record, the reference came on to be heard at the master's office, room No. 818, Hennen Building, in the city of New Orleans, on the 18th day of November, 1899, when and where the receiver and complainant appeared through their solicitor, Joseph P. Blair, Esq. The defendant was absent and unrepresented, notwithstanding due notice served upon it, through its president, Jules A. Blanc, Esq., as per affidavit of service filed as part of this report, marked "Exhibit A." In addition to the parties of record, the special master also notified Solomon Wolff, Esq., attorney at law, of said hearing. Said notice was given to said Wolff, pursuant to his request, and in his capacity as solicitor for Mrs. Nonie M. Chase. The solicitor for the complainant and receiver thereupon proceeded to take testimony, and offered exhibits in evidence, and, pursuant to the order of court appointing the undersigned master, the master herewith files the stenographic report of said hearing, giving the evidence adduced, and noting the various documents and memoranda offered in evidence by the said solicitor for the complainant and receiver; the documentary evidence being also filed

with this report, and being marked, consecutively, "Receiver 1" to "Receiver 44," inclusive. The reference came on further to be heard, after notice duly extended to all parties to the record, at the master's office, as aforesaid, on the 9th day of December, 1899, when and where the receiver appeared in person,—the complainant, through her solicitor, Joseph P. Blair, having notified the master personally that she was willing that the hearing should go on in its absence; the defendant absent and unrepresented, notwithstanding due notice served upon it, through its president, Jules A. Blanc, as per affidavit of service filed with this report, and marked "Exhibit B." The said Solomon Wolff, solicitor for Mrs. Nonie M. Chase, was also present. The master, in the presence of the parties aforesaid, called upon the receiver for certain information and documentary evidence, as will appear from the stenographic report of the hearing, annexed to and made part of this report, and from the documents marked "Receiver 45" to "Receiver 53," inclusive, annexed to and made part of this report. The receiver also subsequently filed with the master the document hereto annexed, and herewith filed, marked "Receiver 54," being document referred to in the testimony of the receiver, near the close, giving statement as to manner in which he reaches his estimate of the probable loss which will result on the sale of the real estate belonging to the defendant association. The foregoing, with the testimony and exhibits annexed to this report, constitutes all of the evidence adduced before me, and all of the proceedings had; and upon same I submit the following report to the court:

The petition of the receiver recites the existence of the bonded and scrip indebtedness of the corporation substantially as hereinafter found by me, and the existence of stock of various classes and series, all also substantially as hereinafter found by me. It sets forth at length the present status of the association, with a description of its assets and liabilities, all of which will, in my finding of facts, hereinafter made, be given in detail, and which I therefore consider it unnecessary at this point to state at length. After reciting the facts in reference to all the matters aforesaid in great detail, the petition of the receiver shows that it is necessary that he should proceed, without avoidable delay, to collect in the obligations of borrowing members, but that in order to produce and maintain equality among all members of the association, and secure a homogeneous administration of the affairs of the association, it is, as the receiver is advised, proper and necessary that the court should instruct him in limine as to the terms and conditions upon which the borrowing members may repay their loans, and the claims in respect thereto which the receiver should assert, in cases where it is necessary for him to sue to compel the payment thereof, to the end that sufficient funds may be realized from the assets of the association not only to pay and discharge the bonded and scrip indebtedness of the corporation, and the expenses of the receivership, but also sufficient to adjust the equities between borrowing and nonborrowing members of the association, and between those whose stock subscriptions have been fully paid and those who have not fully paid for their stock. The receiver further represents that he is advised that by reason of the fact that the defendant association has ceased to be a going concern, and that the court has undertaken the administration of its affairs, for the purpose of making an equitable distribution of its assets among its creditors and stockholders, all debts due by members for loans made, as in his petition detailed, have become due and payable, and that the borrowing members can be required to repay in full what each has received, with interest, and are entitled, after payment of the debts of the association, to pro rata dividends with nonborrowers; the distributive share of each member to be determined with due regard to the payments made on account of stock, the dates of such payments, etc. The receiver further represents that he believes that without endangering the rights of creditors, and without injustice to nonborrowing members, some allowance can be made to borrowing members, in anticipation of the distributive share ultimately coming to them as stockholders, and their loans credited with such allowance, and payment only of the balance required; that in this way the burden upon borrowing members will be lightened, and the expenses of administration lessened; that, as a safeguard against loss or injustice to creditors or nonborrowing mem-

bers, the amount of such anticipatory allowance should be fixed only after making a liberal deduction for all losses in converting the assets of the association into money, and for all expenses of administration; that, with this end in view, the receiver has been diligently engaged since his appointment in accurately informing himself as to the nature and extent of the liabilities of the association, the nature and value of its assets, and the exact status of each member of the association at the date of the institution of the receivership herein. The receiver further sets forth at length the various facts in reference to the amounts and character of stock outstanding, and the value of the assets of the corporation, and submits to the court that from the data prepared by him, and which are in form to be submitted to the court, or to the master to whom his application might be referred, he has reached the conclusion that an allowance of thirty-five per cent. of the book value of the stock, as ascertained by him, may be safely granted to all borrowing members who will settle their indebtedness by promptly paying the balance, without litigation; such allowance to be credited on the loan, and considered as an advance payment on account of the distributive share of the stock held by such borrowers. This allowance is recommended by the receiver on the assumption that all premiums paid or due at the date of the receivership shall be regarded as earned, the same having been so considered in estimating the book value of the stock. He asks for a reference to a master, who shall find all the facts of the case, and state the accounts necessary in the premises, and which accounts are described by the receiver in his petition in great detail. He specially prays that the master may be instructed and authorized, after notice to all parties, to take testimony, and report to the court his findings of fact and conclusions of law in reference to the subject-matter of the application, and that, after due proceedings had, an order or decree be rendered giving him instructions how he shall deal with borrowing members of the defendant association at the present stage of the proceedings in court, and conferring upon him such special authority as may be necessary to carry out such instructions; and he further prays for any other order or decree that may be proper or necessary in the premises, and for general relief. Upon consideration of the petition of the receiver, of which the foregoing is a synopsis, of the record, and of the evidence, I submit the following as my conclusions of fact:

(1) The defendant is a corporation organized under the laws of the state of Louisiana, and is a citizen of said state. Its domicile is in the city of New Orleans, and it is an inhabitant and resident of this district. It belongs to the class of corporations known as building and loan or homestead associations, and was organized by notarial act pursuant to the general laws of the state of Louisiana, and especially to Acts 115 and 151 of the Acts of the General Assembly of said state for the year 1888. The said charter was duly recorded, and was amended at general meetings of the stockholders held September 19, 1893, and November 25, 1895. A true copy of the charter, both original and as amended, is filed with this report, such copies being marked "Receiver 2" and "Receiver 3."

(2) The capital stock of said corporation was by its charter fixed at and limited to fifty million dollars ($50,000,000), divided into five hundred thousand (500,000) shares, of one hundred dollars ($100) each, which shares were further divided into two general classes. One class, consisting of one thousand (1,000) shares, or one hundred thousand dollars ($100,000) in amount, of stock, was and is known and designated as "Guarantee Stock," and was issued at face value only, payable at such time and in such manner as the board of directors might direct, and could be issued for money only, or in exchange for property, or in payment of services rendered. All of said shares have been issued and fully paid as provided for in said charter. The second class of stock, consisting of the remaining four hundred and ninety-nine thousand (499,000) shares, was and is known and designated as "Series Stock," to be paid for in the manner hereinafter set forth. The funds of the association are by the charter in like manner divided into two parts, known as "Guarantee Stock and Expense Fund" and "Series Stock Fund," which funds are declared in the charter to be entirely separate and distinct, the entire guarantee stock and expense fund belonging and being attributed to the guarantee

stock, and the entire series fund belonging and being attributed to the series stock. The charter provides that the guarantee stock and expense fund shall consist of the amount subscribed to the guarantee stock, of the admission fees, of all transfer and withdrawal fees, attorney's fees, and fees for consideration of applications for loans, and one dollar per share per annum from each and every paid-up share of the guarantee stock, together with ten cents per share per month on each and every share of series stock that is subscribed for, payable out of the monthly installment of seventy cents per share of the series stock, whenever paid, and one dollar per share per annum from each and every share of the series stock, after it has been paid for in full, until such shares are liquidated. In any year in which the expenses of the association do not entirely consume the amount set aside to the guarantee stock and expense fund, the excess is to be set aside as reserve guarantee stock and expense fund. Out of this amount belonging to the guarantee stock and expense fund, the board of directors are required to pay and liquidate all the operating expenses of the association, the salaries of officers and agents, commissions, compensation for services of whatsoever kind, and expenses incident to printing, advertising, stationery, and all other expenses of the association, except taxes and licenses, rent, and the cost of collecting and transmitting all moneys to and from the home office. The charter, as amended, further provides that in each year the paid-up guarantee stock shall receive, and there shall be apportioned to it as dividends out of the general earnings of that year of the association, a dividend at the same rate of profit as the dividend declared on the series stock for that year. Neither the series stock fund, nor any of the branches or series of the association, shall have any right or claim upon or to any participation in said guarantee stock and expense fund at any time. The charter provides that the series stock fund shall consist of receipts that do not go to the guarantee stock and expense fund, and that no part of the series stock fund shall be used in paying any of the amounts which the guarantee stock and expense fund is, as above stated, required to pay.

(3) During the business life of the association the distinction between the said two funds has been observed, and they have been kept separate and distinct. The various sources from which the guarantee stock and expense fund were from time to time to be replenished had been generally absorbed by the operating expenses, so that no surplus arose or exists. Said fund sustained a loss of twenty-one thousand five hundred and sixty three $76/100 dollars ($21,563.76) by the failure in 1896 of the American National Bank of this city, where its cash was on deposit. At the time when said loss was sustained the association was engaged in erecting a large building, to be paid for out of said guarantee stock and expense fund, and to be used as the office of the company. In order to complete said building, it became necessary for the association to incur an indebtedness, and to secure the same by a pledge of certain mortgage bonds issued for that purpose. The amount of said indebtedness so incurred was at the date of the receivership, and now is, the sum of twenty-two thousand eight hundred and twenty $78/100 dollars ($22,820.78). It is secured by a pledge of thirty-five thousand dollars ($35,000) of bonds authorized by a resolution of the board of directors of the association of date November 13, 1896, and which bonds, upon their face, purport to bind the guarantee stock only, are dated January 1, 1897, bear five per cent. per annum interest, mature January 1, 1907, and are secured by special mortgage on said office building.

(4) I find that the assets or resources and liabilities of said guarantee stock and expense fund were on the day when the receiver was appointed herein, to wit, on the 3d day of June, 1899, as follows:

### Resources.

| | | |
|---|---:|---:|
| Office building | $ 75,134 | 96 |
| American National Bank, in liquidation | 22,352 | 81 |
| Guarantee stock and expense fund | 19,355 | 41 |
| Furniture and fixtures | 5,480 | 53 |
| Interstate League Building and Loan Associations | 288 | 20 |
| Petty cash | 73 | 21 |
| | $122,685 | 12 |

Liabilities.

| | | |
|---|---|---|
| Guarantee stock | $100,000 00 | |
| Hibernia National Bank | 22,685 12 | |
| | | $122,685 12 |

(5) The series stock of the association is divided into several classes, each having its peculiar characteristics, as hereinafter explained,—some fully paid, and some in all stages of gradual completion of payments. Stockholders or members of the association holding series stock are divisible into two classes, to wit, borrowing members, to whom loans have been made, and nonborrowing members or investors, who are not indebted to the association. The stock of each class is further divided into series numbered 1, 2, 3, and so on; all the stock issued in the same month having the same series number. The different classes into which the series stock now outstanding is divided are known and designated as classes A, B, C, E, G, J, L, M, S, and Z. The principles of classification and the rights and obligations of each class are fixed by the by-laws of the association. The by-laws are contained in the three exhibits marked "Receiver 19," "Receiver 27," and "Receiver 16," filed with this report; the first and second of which are printed pamphlets containing the by-laws as they existed May 19, 1890, and May 1, 1897, and the third of which is a typewritten document containing amendments passed subsequently to the latter date. In addition to the by-laws contained in these pamphlets, certain amendments to the by-laws were passed, and, having performed their offices, seem not to have been included in these compilations of by-laws. They constitute several of the other exhibits attached to this report, and will be referred to when necessary. All series stockholders of stock not full paid were required to pay for their stock in monthly installments of seventy cents per month, except series stockholders of class C, who paid one dollar and five cents per month. Out of the payments of seventy cents per month, sixty cents went to the series fund, and ten cents to the guarantee stock and expense fund. Out of the payments of one dollar and five cents per month, ninety cents went to the series fund, and fifteen cents to the guarantee stock and expense fund. The main features of the various series of stock will now be given.

(6) Series stock was issued under article 2, § 5, of the original by-laws, adopted May 19, 1890. It was not, however, designated as class "A" until 1894. A blank certificate, showing the essential rights and obligations arising out of the contract of subscription to this stock, is herewith filed, marked "Receiver 18." The stock is payable in monthly installments of seventy cents per share, sixty cents of which goes to the series fund. Over and above this, each subscriber was required to pay an entrance fee of one dollar per share on each share of stock subscribed for. This one dollar, and ten cents out of each monthly installment of seventy cents, went to the guarantee stock and expense fund. This stock matures whenever the amount of the monthly installments paid thereon, together with the amount of the dividends declared on and credited to said stock, amounts to one hundred dollars ($100) per share. Such stock, when so matured, ceases to be entitled to dividends, and is to be paid in cash or in interest bearing scrip of the association, as the directors may determine; the terms and conditions of said scrip being fixed by the by-laws. When the holder of such matured stock is indebted to the association, the amount of his debt is deducted from the face value of the matured stock, and the remainder, if any, is payable in cash or scrip, as aforesaid. Holders of class A stock, not in arrears or indebted to the association, have a right to surrender their stock and withdraw from the association, and receive the surrender or withdrawal value of their stock as fixed and determined by certain rules laid down in the by-laws, and under which the said withdrawal value is upon terms more and more favorable to the withdrawing member in proportion to the duration of his membership, and to the number of payments made by him. The borrowing members of class A have received loans from the association of varying amounts, not exceeding the face value of the stock subscribed for, which are evidenced by the personal obligation of the borrowers, in the shape of promissory notes, and secured outside of the state of Louisiana by first mortgage or deed of trust on real estate, and also by pledge of the stock subscribed for, and in the state of Louisiana by vendor's lien and privilege reserved, as well as by mort-

gage and pledge of stock subscribed for. The intending borrowers in the state of Louisiana were required to sell the real estate to be hypothecated by them to the association at a nominal cash consideration, equal to the amount of the proposed loan. Immediately after the sale by the borrower to the association, the association immediately (that is to say, on the same day) resold the property to the intending borrower at the same figures at which it had been acquired by the association, for a consideration of a trifling amount in cash, being the excess of the purchase price over the amount to be loaned; and for the balance of the purchase price the borrower made and subscribed his promissory note for the amount of the loan, payable at a fixed maturity after date, bearing interest at six per cent. per annum from date until paid, but with a privilege of renewal, practically annulling the clause fixing the maturity of the obligation, which renewal clause provided that if the purchaser should pay the interest on his note monthly, and should also pay the installments due upon his stock promptly and punctually, then that the principal of the note should not become exigible until the value of the stock held by the borrower, with dividends or accumulations thereon, should become equal to the amount of the obligation, with all interest and costs that might be due upon the same, at the happening of which event said stock and such indebtedness should cancel each other,—the stock and the indebtedness being alike extinguished,—and that thereupon it should be the duty of the corporation to cancel the stock and give the purchaser full receipt and acquittance, as well as to surrender to the purchaser the promissory note or obligation, or any other note that might have been furnished in place thereof. It is further provided that upon the failure of the borrower, for the term of two months, to pay the installments of interest or premiums or dues, or any portion thereof, or any and all costs and fines that might become due by said borrower to the corporation, such failure should at once, without demand or putting in default, and as a penalty, make the promissory note, with all back interest thereon, immediately due and exigible, and should entitle the corporation to enforce by executory process or by ordinary proceedings at law the collection of the note, and of all interest and premiums due thereon, together with all sums due the corporation for insurance premiums, taxes, installments on the shares of stock, and attorney's fees, as therein provided, and that any sale of the stock for arrearages under the provisions of the charter should have a similar effect. The agreement also contained provisions entitling the borrower to pay off his debt before maturity, upon certain conditions, and in an agreed manner. In the event that the promissory note or obligation should become due and exigible according to its tenor, and that the value of the stock should not be equal to the amount of the indebtedness, then the corporation bound itself to renew and extend the note in accordance with the charter and by-laws. The borrowers, in addition to the payments above mentioned, which were entirely on account of their stock subscriptions, and not on account of their loans, and which were credited on the books of the association to the stock subscriptions, were required to pay a certain fee to cover cost of abstract of title, examination of title, etc.; to pay six per cent. per annum interest and six per cent. per annum premium on their loans, payable monthly, to wit, fifty cents interest per month and fifty cents premium per month on each one hundred dollars ($100) borrowed. When the withdrawal value of the stock borrowed equaled the amount of the loan indebtedness, it was provided by the terms of the agreement that the borrower's note might be canceled and returned, and his shares canceled. The number of shares of class A, not full paid, issued and outstanding on October 1, 1899, amounted to eighty-one hundred and sixty-six (8,166) shares, none of which was matured, and of which four thousand and sixty-seven (4,067) shares standing in the names of borrowing members were pledged to the association. The amount of indebtedness due to the association by members of this class was on said date three hundred and fourteen thousand nine hundred and eighty-eight dollars ($314,988), face value, of which two hundred and eighty-eight thousand two hundred and thirty dollars ($288,230) was secured by pledge of stock and by mortgage, and twenty-six thousand seven hundred and fifty-eight dollars ($26,758) of which was secured only by pledge of stock. There is also issued and outstanding

full-paid series stock of class A, issued upon the payment of one dollar membership fee, and one hundred dollars ($100) par value of each share of stock. This full-paid stock is of three kinds, designated as "class A, full paid, ten per cent. per annum cash dividend"; "class A, full paid, eight per cent. per annum cash dividend"; and "class A, full paid, six per cent. per annum cash dividend." Each share of such full-paid stock is required to pay one dollar per annum to the association for the expense fund until such stock is liquidated. After the rest of the stock in the series to which such full-paid share belongs shall have matured, it is provided that such full-paid share becomes matured stock, and all matured stock is treated in the same way. Holders of the stock of the ten per cent. class are entitled to have paid to them the full amount of the dividends declared on such stock up to five per cent. semiannually on the face value of the stock, payable on the 1st days of July and January of each year. All dividends over and above five per cent. semiannually shall be payable to the holders of the stock when it shall have matured, and are to be liquidated at the same time and in the same manner as the certificate of stock on which it has accrued, and of which it forms a part. When the stock matures, the certificate is to be surrendered to the association and liquidated as provided in the by-laws. Holders of the eight per cent. cash dividend full-paid stock are entitled to like dividends up to four per cent. semiannually, and all dividends over and above four per cent. are in like manner payable when said stock shall have matured. Holders of the six per cent. cash dividend full-paid stock are entitled to like dividends up to three per cent. semiannually, and all dividends over three per cent. and up to four and one-half per cent. semiannually are in like manner payable upon the maturity of the stock. When any of the stock matures, the certificate is to be surrendered and liquidated as provided in the by-laws. On October 1, 1899, there were outstanding of said class A ten per cent. dividend stock three hundred and forty-five (345) shares, of the par value of thirty-four thousand five hundred dollars ($34,500); of said class A eight per cent. dividend stock, three hundred and forty seven (347) shares, of the par value of thirty-four thousand seven hundred dollars ($34,-700); and of the class A six per cent. dividend stock three (3) shares, of the par value of three hundred dollars ($300).

(7) I find that the principal features of series stock, class B and class E, were and are as follows: Both of said classes consist of subscribing members who are all borrowers, and whose loans are for the face value of the stock subscribed for, evidenced by notes payable one hundred and forty-two (142) months after date. The notes of class B bear interest at the rate of six per cent. per annum, payable monthly; i. e. fifty cents per share per month. The notes of class E bear seven and two-tenths per annum interest, payable monthly; i. e. sixty cents per month per share. These loans are secured by mortgage or deed of trust and pledge of stock as in the class A loans. Members of class B and class E pay no premiums on account of their loans, and agree that they shall have only such share in the profits of the association as may be necessary to make up the par value of their stock after one hundred and forty-two (142) monthly payments of seventy cents per month shall have been made, less ten cents per month belonging to the guarantee stock and expense fund. The total number of shares outstanding October 1, 1899, of class B, is eleven hundred and eighty-two (1,182), and the loans due the association by the members thereof amount to one hundred and eighteen thousand two hundred dollars ($118,200). The total number of shares outstanding October 1, 1899, of class E, is three hundred and sixty-seven (367), and the loans due by the members thereof amount to thirty-six thousand seven hundred dollars ($36,700). Series stock class C differs from class B and class E only in that the monthly payment on account of the stock subscription is at the rate of one dollar and five cents per month, of which ninety cents goes to the series fund at the maturity of the stock, and the loan is for ninety-six (96) months, instead of for one hundred and forty-two (142) months. The amount of stock of this class issued and outstanding on October 1, 1899, was one hundred and fifty-nine (159) shares, and the loans due by the holders thereof amounted to fifteen thousand nine hundred dollars ($15,900).

(8) The stock of class G is of the same general character as the stock of classes B, C, and E, except that the maturity of the stock and loans is sixty-two months; the by-laws providing for the issuance of such stock in the form of certificates for two, or multiples of two, shares, to be retired, at a value of fifty dollars ($50) per share, when sixty-two (62) monthly dues, of seventy cents per share, have fallen due and been paid. On October 1, 1899, there were outstanding, of this class, twenty-eight (28) shares, and the amount of loans due by holders thereof amounted to fourteen hundred dollars ($1,400). The stock of class J differs from class G, in that each certificate is issued for three, or multiples of three, shares; the said stock to be retired, at the value of eighty-three and one-third dollars per share, when ninety-six (96) months' dues, of seventy cents per share, have fallen due and been paid. On October 1, 1899, there were outstanding of this class J thirty (30) shares, and the loans due by the holders thereof amounted to twenty-five hundred dollars ($2,500). The stock of class L differs from class G, in that each certificate was issued for not less than three shares; said stock to be retired, at the value of one hundred dollars for each share, when one hundred and twenty (120) months' dues, of seventy cents per share, have fallen due and been paid. On October 1, 1899, there was outstanding of this class thirty-one shares, and the loans due by the holders thereof amounted to thirty-one hundred dollars ($3,100). The stock of class M differs from class L, in that the stock is to be retired, at a value of one hundred dollars for each share, when one hundred and thirty (130) months' dues, of seventy cents per share, have fallen due and been paid. On October 1, 1899, the number of outstanding shares of this class was seven (7), and the loans due by the holders thereof amounted to seven hundred dollars ($700).

(9) Class S of the series stock consists entirely of investors' stock, no loans having been made to the members of this class. This stock is payable at any time, in installments of five dollars, or multiples of five; and on such payments the by-laws provide for the payment of interest at the rate of four per cent. per annum in cash until said stock is full paid, and thereafter it is entitled to a cash dividend up to three per cent. semiannually out of the earnings of the association; and it also receives a credit of one dollar per share, or one per cent. per annum, which is paid into the guarantee stock and expense fund, in accordance with the charter. It is further provided that full-paid stock, class S, shall not participate in the earnings beyond the seven per cent. aforesaid, namely, six per cent. cash dividend, and one per cent. per annum paid into the expense fund. The amount of this class of stock issued and outstanding October 1, 1899, was seven shares, all of which are full paid up. This stock has a withdrawal value, fixed by the by-laws.

(10) Class Z of the series stock fund is permanent, full-paid stock, issued only for one hundred dollars ($100) per share, or twenty-five dollars ($25) per quarter share, paid at the time of the subscription. The members thereof cannot withdraw from the association. Their stock can be pledged for fifty per cent. of its face value. The by-laws provide that this stock shall be paid cash dividends up to four per cent. semiannually (eight per cent. annually) out of the amount of earnings of the association, and shall also receive a credit of one dollar per share, or one per cent. per annum, which shall be paid annually into the expense fund of the association, and it participates fully in the earnings of the association. The amounts apportioned to it in each year, over and above the nine per cent. fund provided for as its dividend, are to be put to the credit of the stock in class Z, and the fund so constituted is to be invested by the directors, and the profits to belong to, and to be entirely passed to the credit of, stock class Z; but no such fund ever arose. The amount of said stock issued and outstanding October 1, 1899, was nine hundred and thirteen and one-fourth (913¼) shares, and the amount of loans outstanding thereon was five thousand six hundred dollars ($5,600), secured by a pledge of one hundred and thirteen (113) shares of said stock.

(11) The master presents the following tableau, showing the salient features of the various classes of stock, and presenting in condensed form the facts essential to decide any questions of law which may arise in reference to the rights and obligations of the persons interested therein:

## DESCRIPTION OF FORMS OF STOCK OF NEW SOUTH BUILDING & LOAN ASS'N.

| Series. | Obligation as Stockholder Per Month. | Obligation as Borrower Per Month. | Rights as Stockholder. |
|---|---|---|---|
| **A.** Not full paid. | 70 cts. | 6 per cent. interest and 6 per cent. premium per annum. | Participates in all profits. |
| — Full paid, 10 per cent. | None. | None. | 10 per cent. interest, if earned, and participates in all profits; payable at maturity. |
| — Full paid, 8 per cent. | None. | None. | 8 per cent. interest, if earned, and participates in all profits; payable at maturity. |
| — Full paid, 6 per cent. | None. | None. | 6 per cent. interest, if earned, and participates in all profits; payable at maturity. |
| **B.** Not full paid. | 70 cts. for 142 months. | 6 per cent. interest per annum. | Participates in profits only to extent necessary to make up par value of stock after payments named. |
| **C.** Not full paid. | $1.05 for 96 months. | 7 8-10 per cent. interest per annum. | Participates in profits only to extent necessary to make up par value of stock after payments named. |
| **E.** Not full paid. | 70 cts. for 142 months. | 7 2-10 per cent interest per annum. | Participates in profits only to extent necessary to make up par value of stock after payments named. |
| **G.** Not full paid. | 70 cts. for 62 months. | 6 per cent. interest per annum and 30 cts. premium per month. | Stock retired at $50 per share at end of 62 months. |
| **J.** Not full paid. | 70 cts. for 96 months. | 6 per cent. interest per annum and 20 cts. premium per month. | Stock retired at $83¼ per share at end of 96 months. |
| **L.** Not full paid. | 70 cts. for 120 months. | 6 per cent. interest per annum and 15 cts. premium per month. | Stock retired at $100 per share at end of 120 months. |
| **M.** Not full paid. | 70 cts. for 130 months. | 6 per cent. interest per annum and 12½ cts. premium per month. | Stock retired at $100 per share at end of 130 months. |
| **S.** | For investors only. Payable $5 on application; balance at pleasure within 3 years—4 per cent. interest allowed on all amounts paid in until full paid. when bears 6 per cent., payable out of earnings, and no further participation in profits. | | |
| **Z.** | Payable cash. Interest up to 8 per cent. payable out of earnings. Participates in profits beyond this, but profits go to reserve fund, and are not distributable, except in very remote contingency. May borrow up to 50 per cent. of value. | | |

We may still further condense as follows:

Series A. Typical building and loan association stock: That is to say, stock whose holders are burdened with the obligations and enjoy the benefits usually imposed upon or accruing to the holders of stock in, and borrowers from, building and loan associations.

Full paid ten per cent., eight per cent., and six per cent. stock: This is full-paid stock, the profits upon which, to the extent stipulated, are payable semiannually, and any profits in excess of such stipulated profits remain in the hands of the association, to the credit of such stock, until the maturity of the series to which it belongs.

Series B, C, and E. In all of these series fixed monthly payments are made on the stock for a stated number of months. Loans are made upon the stock

at different rates, as stipulated. These loans are payable out of the stock subscriptions, and the stock participates in the profits of the association only to the extent necessary to mature it; that is to say, to make it worth par.

Series G, J, L, and M. The subscription to the stock of these issues constitutes a definite contract for the payment of seventy cents per share on the stock for a fixed number of months. The borrowing members of these classes pay six per cent. interest on their loans, and a fixed number of cents per month premium. The stock payments for the definite period named extinguish the loans.

Series S and Z. These two series are for investors only, who receive interest out of the earnings. The holders of series Z stock have the privilege of borrowing from the association upon a pledge of their stock up to fifty per cent. of its full-paid value.

The resources and liabilities of the series stock fund of the association are given in detail in the document "Receiver 42," and at page 35 of the same document will be found a recapitulation of those resources and liabilities, as follows:

Resources.

| | | | |
|---|---|---|---|
| 1. | Real estate .............................. | $222,559 45 | |
| 2. | Loans on real estate...................... | 471,730 00 | |
| 3. | Loans on stock........................... | 32,358 00 | |
| 4. | Cash in banks............................ | 47,317 90 | |
| 5. | Bills receivable ......................... | 10,560 35 | |
| 6. | H. T. Ellis, Troy, Ala.................... | 108 90 | |
| 7. | E. W. Morrill, Biloxi, Miss............... | 492 94 | |
| 8. | P. Jacobs, Lake Charles, La............... | 899 09 | |
| 9. | American National Bank, in liquidation... | 492 55 | |
| 10. | Installments due by stockholders to May 31, 1899 .................................. | 30,012 15 | |
| 11. | Premiums ($13,368.68) and interest ($18,-271.70) due by borrowing stockholders to May 31, 1899.......................... | 31,640 38 | |
| 12. | Insurance and taxes due by borrowing stockholders to May 31, 1899............ | 2,783 16 | |
| 13. | Bond deposit in suit S. A. & E. G. Chaffin, Troy, Ala. ............................. | 1,000 00 | $851,954 87 |

Liabilities.

| | | | |
|---|---|---|---|
| 1. | Bonds A. & C............................. | $134,500 00 | |
| 2. | Scrip ................................... | 67,994 05 | |
| 3. | Mehle & Kausler.......................... | 122 00 | |
| 4. | Denegre, Cummings & Co., Limited........ | 169 15 | |
| 5. | Guarantee stock and expense fund........ | 228 00 | |
| 6. | Guarantee stock and expense fund, conditional on collection...................... | 4,287 45 | |
| 7. | Value of certificates of stock, all classes... | 639,195 74 | |
| 8. | Reserve for coupons on bonds and interest on scrip ............................... | 5,458 48 | $851,954 87 |

(13) I find that the value of item 1 of resources (real estate belonging to the association) may, after careful appraisement, be fixed at $122,559.45; that the value of items 2 and 11 (being amount of loans on real estate, and interest due thereon) are worth seventy-five per cent. of the face value of said items, or $367,501.70; that the value of item 3 (loans on stock) is well worth the sum of $20,553; that the fourth item (cash in bank) amounts to $47,317.90; that the fifth, sixth, seventh, and eighth items are worth their face, and amount to $12,061.28; that the ninth item (American National Bank, in liquidation), $492.55, is practically worthless; that the tenth item (installments due by stockholders to May 31, 1899), $30,012.15, should, for the purposes of this inquiry, be considered as worth its face value, because, if the installments be due by nonborrowing stockholders, they will, if the

prayer of the receiver's petition be granted, be extinguished by the dividends to be declared upon the stock, and, if due by borrowing stockholders, they will, if the prayer of the petition be granted, be paid in any settlement which may be reached with such borrowing stockholders. I find that the part of the eleventh item (of resources) consisting of the amount of premiums due by stockholders, $13,368.68, has been by the receiver entirely disregarded in his exhibit marked "Receiver 41," for the reason that he considers its recovery doubtful. I do not think it necessary at present to decide the value of this asset, but find that, for the purposes of the present application, the course adopted by the receiver in disregarding this item and treating it as of no value is eminently proper and conservative; and I therefore follow him in disregarding it. The twelfth item (being insurance and taxes due by borrowing stockholders), $2,783.16, should, for the purposes of the present inquiry, be treated as worth its face, as it is secured by mortgage on real estate, and constitutes a portion of the indebtedness in reference to which the receiver seeks the advice of the court. I find that the thirteenth item (being bond deposit, etc.) is worth its face, or $1,000. I find that the total of the above items is $603,788.64.

(14) The first item of liabilities is for bonds, amounting to $134,500. These bonds are due to third persons. Their validity is undisputed, and they constitute a liability of the association for their full face value. I shall have occasion hereafter to further refer to these bonds, and to describe them more accurately. The second item of liabilities consists of scrip of the association amounting to $67,994.05. This scrip was issued to stockholders of the association whose stock matured or had been withdrawn from the association in accordance with the terms of the charter and by-laws prior to the appointment of the receiver. It constitutes an obligation for its full face value to persons who were once series stockholders, but whose relations to the company as stockholders had been severed before the appointment of the receiver herein. The third, fourth, and fifth items of liabilities are debts due by the association to others than to series stockholders, and I find the full amount of the same to be due. The sixth item of liabilities is for the amount of $4,287.45. This amount consists of the portion of the payments of installments by stockholders which, under the terms of the charter, the by-laws, and the contracts of subscription, are due the guarantee stock and expense fund. If settlements are to be made by the receiver with borrowing stockholders, or if the amounts due by these stockholders are to be collected through judicial proceedings, this amount constitutes a liability of the series stock fund to the guarantee stock and expense fund, and should, for the purposes of the present investigation, be treated as a fixed liability. I disregard for the present the seventh item of liabilities. That item is the value of certificates of series stock of all classes, and, as it is to be postponed to obligations due to others than stockholders, it is for the present disregarded. The eighth item of liabilities, entitled "Reserve for coupons on bonds and interest on scrip," should be replaced by the figures given by the receiver in document "Receiver 41" as the amount of interest on bonds and scrip due and to become due up to June 30, 1900, and amounting to $19,604.50. An addition of the various items of liabilities as above found will give a total of $226,905.15. In his statement "Receiver 41," the receiver estimates and allows for costs of receivership, for unforeseen losses, and contingent expenses, a total of $150,000, which I find to be a full estimate for the purposes named. Adding this amount of $150,000 to the liabilities above named, I find that the total amount of liabilities, actual or contingent, to be deducted from the total of assets, in order to find the amount which will probably remain for distribution among series stockholders, is the sum of $376,905.15.

(16) The total assets of the association are, at a low valuation, well worth the sum of $603,788.64; the liabilities, actual and contingent, as above, amount to $376,905.15; leaving a remainder for distribution among series stockholders of $226,883.49.

(17) The present book value of the certificates of stock of all classes is $639,195.74. This book value is ascertained by careful, accurate, and rather intricate calculations, differing for the stock of the different classes, and the

results in each case are obtained by applying certain formulæ, fully detailed in the documents marked "Receiver 43" and 'Receiver 44." A dividend of thirty-five per cent. upon the total present value of the certificates of stock of all classes, amounting as aforesaid to $639,195.74, would amount to $223,-718.50.

(19) The master further considers it important to find and report the facts in relation to the security given for, and the present status of, the bonds of the association, amounting, as hereinabove set forth, to $134,-500. The history of these obligations is as follows: By an agreement of date December 14, 1891 (Document Receiver 30), between the New South Building & Loan Association and the Manhattan Trust Company of New York, the association constituted the trust company a trustee for the purpose of securing the purchasers and protecting its stockholders and creditors, and securing to the purchasers of certain bonds to be issued by it the prompt payment thereof and the interest to accrue thereon. The agreement in question provides that the bonds shall be issued in such series, for such denominations, and for such period of time as the association should determine; that as security for the payment of the bonds the association might from time to time, at its discretion, deposit with the trustee cash or real estate securities, being first liens, and taken by the association in the regular course of its business, and that each series of bonds should be wholly independent of any other series in the matter of securities; that the securities should be assigned to the trust company; that the trustee should indorse its certificate of such deposit upon the bonds of the building and loan association to an amount not to exceed one hundred dollars for every one hundred dollars in cash or one hundred and twenty-five dollars ($125) in such securities so deposited; that the association should have the right at any time to withdraw from the hands of the trustee the cash or securities deposited with it, by substituting securities of equal face value, of the character mentioned in the trustee's certificate, or upon deposits of one hundred dollars ($100) cash for each one hundred and twenty-five dollars ($125) of said securities. The association further had the right, upon surrender to the trustee of any bond theretofore countersigned by the trustee, to demand the relinquishment and delivery to it of a pro rata share of the cash or securities in its hands pledged for the payment of the series whereof such bond constituted a part; and, as long as the association should not be in default, it was to be entitled to receive and collect the interest and premiums due upon the securities in the hands of the trustee. Provisions were made for proper proceedings to be taken in case of a default in the payment of the interest or principal of the bonds. The trust company further agreed to keep on deposit for the association, for the general benefit of all the members and creditors of the association, any and all securities that might be deposited with it for that purpose by the association, and to certify to the amount of the securities so deposited, and to the object for which they were deposited, from time to time, as requested by the association; such certificates to be, in substance, as follows: "This is to certify that the New South Building and Loan Association has on deposit this day with the Manhattan Trust Company of New York City, for the benefit of its members and creditors, ——— dollars ($———), of the face value of its securities." The agreement further provided that the securities, except such amount as might be specifically deposited to secure the bonds, might be withdrawn, in whole or in part, at any time by the association, upon surrender to the trustee of the certificate or certificates issued by the company as covering the deposit of such securities. The foregoing are the only provisions of the agreement which I deem it necessary to insert in these findings of fact. Subsequently to the date of said agreement, to wit, on the 23d day of February, 1894, a supplemental agreement was entered into between the New South Building & Loan Association and the Manhattan Trust Company, amending the original agreement of December 14, 1891, and limiting the amount of bonds to be issued under said agreement to one hundred thousand dollars ($100,000), par value, and increasing the deposit of securities for said one hundred thousand dollars ($100,000) of bonds to two hundred and fifty thousand dollars ($250,-000), instead of one hundred and twenty-five thousand dollars ($125,000), as

was provided in the original agreement, and further amending the agreement by incorporating such new provisions in it, and making the same a part of said outstanding bonds, to continue during the life of the same, and providing that the trust company's claim for compensation for its services as trustee under said agreement should be a first lien upon the additional one hundred and twenty-five thousand dollars ($125,000) of securities deposited for the protection of said bonds as therein provided, and abrogating a provision in the original agreement providing that the claim of the trust company for compensation should be a personal one against the New South Building & Loan Association, and not a lien on the securities in its hands as trustee. The Manhattan Trust Company having declined to continue to act as trustee, the American Trust & Banking Company, located at Atlanta, Georgia, was, pursuant to the terms of the original agreement, substituted as trustee in lieu and stead of the Manhattan Trust Company. The new trustee received from the old one the sum of twelve thousand dollars ($12,000) in cash and securities, the face value of which amounted to two hundred and twenty-five thousand five hundred dollars ($225,500). By another agreement, of date December 14, 1893, the New South Building & Loan Association constituted the American Trust & Banking Company its trustee for the purpose of securing a different issue of bonds. This agreement is practically a duplicate of the one with the Manhattan Trust Company, in its amended form. Under the agreements aforesaid the American Loan & Trust Company received from the New South Building & Loan Association a very large amount of the obligations of borrowing members of the association, the amount being given by the receiver in his testimony, to this report attached, at nearly four hundred and fifty thousand dollars ($450,000), and in the bill of intervention hereinafter referred to at four hundred and forty-six thousand four hundred and sixty-six dollars ($446,466).

After the receiver had been appointed in this cause, and also under ancillary bills filed in other districts in the Fifth circuit, he filed a petition in one of those ancillary causes pending in the Northern district of Georgia, seeking the possession of the assets held by the American Trust Company of Atlanta, Georgia. This application was heard before the Honorable D. D. Shelby, circuit judge, who rendered an order that the receiver was entitled to the possession of all the assets and securities of the New South Building & Loan Association held by the American Trust & Banking Company of Atlanta, Georgia, in order that he might collect in, and administer upon the same, and distribute the proceeds under the orders of the court which appointed him, and in accordance with the rights of all parties having any claims in respect thereto, and further ordering that the American Trust & Banking Company should turn over and deliver said assets and securities into the possession of the receiver. The purpose of the delivery to the receiver by the order was declared to be to enable the receiver to protect, preserve, and collect in the said assets and securities, and to hold the proceeds thereof subject to the orders of the court which appointed him; and the order was declared to be made without prejudice to, but with full reservation of, the rights of all parties, and especially of the holders of any bonds issued under either or any of the agreements above described; such rights being reserved to the proceeds of the assets and securities, and to be asserted in appropriate proceedings hereafter. The receiver was further ordered and directed to take and keep a separate account of said assets and securities, and to deposit to his credit as receiver with the American Trust & Banking Company of Atlanta, and there to keep subject to the further orders of the court, the cash assets received under the order, and all collections made by him on the other assets turned over to him under the order. Subsequently to the rendering of the above order by the Honorable D. D. Shelby, circuit judge, the American Trust & Banking Company filed its petition for leave to intervene, and its bill of intervention, in the United States circuit court for the Northern district of Georgia, which petition and bill set forth the facts above found in reference to the agreements constituting it as trustee for the purposes above found; alleged the order of Judge Shelby; the fact that it had, under said order, delivered to the receiver herein securities amounting **to four hundred and forty-six thousand four**

hundred and sixty-six dollars ($446,466), face value; that, in addition to the bonded indebtedness, there were other creditors of the building and loan association, known as "scrip holders," whose claims amounted to sixty-seven or sixty-eight thousand dollars; that intervener was not sufficiently advised to state whether there were other creditors of the association or not; that, under the deeds of trust set forth in its bill, the intervener had been designated as trustee, charged with the duty of holding the securities placed in its hands for the protection of outstanding bonds; that under said deeds of trust, and likewise in compliance with the laws of Georgia, the intervener was named as trustee and depository of securities for the benefit of creditors and shareholders of the association; and that the securities, as well as the proceeds thereof, were charged with a trust for the benefit and protection of the bonded indebtedness and other indebtedness of the association, as well as of the shareholders therein. The bill further averred the insolvency of the association, and the necessity of submitting to a master the ascertainment of the indebtedness of all characters of the association, the amount of stock, and different classes thereof, and the ascertainment and defining of the rights, interests, and claims of all parties, and the distribution of the assets of the association. The bill contained other allegations, but the above are deemed by me sufficient for the purpose of explaining the scope of the bill, which prayed that the intervention might be allowed; for proper service of process; for a decree that all of the bonds of the association, with accrued interest, are due; that the intervener might have a decree and judgment for the amount of all other indebtedness, as the same might be ascertained to be owing by the association; that the same might be declared due, with interest, and that all creditors might be decreed to participate in the distribution of the proceeds of the assets pledged to intervener as trustee, in accordance with their rights and equities; that intervener might have a general decree and judgment against all of the assets of the association for the amount of principal and interest which might be ascertained to be due upon the outstanding bonds of the association; that intervener might have a special decree and judgment against the securities placed in its hands as trustee for the protection of said bonds, and against the proceeds of the same, and a general decree and judgment in favor of the creditors of the association, subject to the special decree and judgment in its favor, for the benefit of bondholders, and for the amount of principal and interest due thereon; that, subject to the general and special judgments and decrees in favor of bondholders and creditors, intervener might have a general decree for distributing the balance, if any, of the assets of the association, after the same should have been converted into money, and after deducting all of the expenses of administration of the estate, among the shareholders or other persons entitled to participate therein; that intervener might have a general decree and judgment against the estate for all the costs and expenses of administering the same, including its counsel fees, and reasonable compensation to itself as trustee for its services, and for all legitimate charges and expenses, and for all further and general relief.

The foregoing constitutes my finding of the material facts of this case, shown by the evidence adduced before me, and which I consider relevant to the inquiry which the court has directed me to make. The application of the receiver is necessarily one made ex parte. The action which the receiver seeks to take is approved of by the complainant, and apparently acquiesced in by the defendant, as it did not appear before the master, although duly notified. Neither the American Trust & Banking Company, which has filed a bill in the United States circuit court for the Northern district of Georgia, seeking to control the administration of almost all of the assets belonging to the series stock fund, and in the hands of the receiver, nor any other creditor of the defendant association, is a party to these proceedings. Only one stockholder, and that one a borrowing stockholder, voluntarily appeared before me. I state these facts very fully, in order to show the extreme care which should be exercised by the court in the premises, and the great caution to be observed in dealing with a large amount of assets in the hands of the receiver, in which so many persons are interested, none of whom, with the one or two exceptions above named,

have been heard. It is nevertheless unquestionably true that unless some scheme be devised by which a homogeneous administration of the affairs of the association may be secured, and unless a plan of liquidating the affairs of the defendant corporation can be devised which, whilst fair to nonborrowing stockholders and to creditors, will also appeal to borrowing members, and stimulate a settlement of loans, the interests of all persons concerned in the association as stockholders, whether borrowing or nonborrowing, will be sacrificed, and the assets squandered to such an extent, in expenses of a tedious litigation, that little, if anything, will be realized for any one, except creditors, whose claims are not large in proportion to the probable value of the assets, and who ought, if the affairs of the association be prudently administered, to be paid off, and a handsome surplus left for the stockholders. I do not think it possible to read the petition of the receiver, and the foregoing statement of facts, without reaching the conclusion that the course suggested by the receiver, of allowing borrowing members in the association to settle their indebtedness, after crediting it with such an amount as may safely be fixed upon, as a distributive share to hereafter accrue to said borrowing members out of the distribution of the assets of the corporation, is eminently wise, provided it be possible to make such an allowance, without infringing upon the vested rights of any one else in interest.

I shall now consider the rights and obligations of the different creditors of the association, and of the various classes of stockholders, and attempt to reach some scheme of liquidating the affairs of the association in the general manner suggested by the receiver in his petition, and which will amply protect the rights and equities of every person in interest. The process upon which the distribution of the assets of an insolvent building association is to be made is not altogether free from difficulty. One proposition is, however, too plain for discussion, to wit, that, as between outside creditors and stockholders, the former are first entitled to satisfaction of their demands, ahead of all claims based on stock holdings. See End. Bldg. Ass'ns (2d Ed.) p. 502, and authorities there cited. I shall therefore first consider the claims of outside creditors, and thereafter of stockholders. Before taking up this subject, however, it is necessary to note that the New South Building & Loan Association was a peculiar corporation, in that from the very origin of the corporation its stock and stockholders were divided into two different classes, each enjoying rights and subject to obligations so entirely distinct from the other that the association was really a dual corporation. The rights and obligations of the holders of guarantee stock were so entirely separate and distinct from the rights and obligations of the holders of the other class of stock, known as "Series Stock," that when certain bonds were to be issued for the purpose of raising funds to complete an office building, which was to be constructed at the expense of and for account of the guarantee stock, the bonds did not, upon their face, purport to bind the association itself, but only the guarantee stock. See findings of fact, supra (paragraphs 2 and 3). It therefore becomes necessary to consider the two classes of stock entirely separate from each other, and to fix the rights and obligations of the persons interested in each class of stock entirely independently of the rights and obligations of those interested in the other class of stock. As the association and both of its funds are amply solvent as to outside creditors, we are at least relieved of the consideration of some very troublesome questions which might arise as to the rights of the creditors of the respective funds if the association were insolvent as to outside creditors. With these preliminary remarks, I take up the details of the case.

Rights and Obligations of Holders of Guarantee Stock, and of Creditors Having Claims against Guarantee Stock and Expense Fund.

The capital stock of the corporation was by its charter divided into two general classes, one consisting of one thousand shares, or one hundred thousand dollars ($100,000) in amount of stock, known and designated as "Guarantee Stock," and the remainder known and designated as "Series Stock." All of the guarantee stock was issued and full paid for prior to the appointment of the receiver in this cause. The funds of the association were by its

charter divided into two parts, known, respectively, as "Guarantee Stock and Expense Fund" and "Series Stock Fund," which funds were by the charter declared to be entirely separate and 'distinct, the guarantee stock and expense fund belonging and being attributed to the guarantee stock, and the series fund to the series stock. The manner in which the guarantee stock and expense fund was made up, and all other necessary details as to the guarantee stock, is given in the foregoing finding of facts. Paragraphs 3 and 4. Out of the amount belonging to the guarantee stock and expense fund the board of directors were required to pay and liquidate all the operating expenses of the association, salaries of officers, commissions, compensation for services of every kind, and expenses incident to printing, advertising, stationery, and all other expenses of the association, except taxes and licenses, rent, and the cost of collecting and transmitting of moneys to and from the home office. During the whole business life of the association the difference between this stock and the series stock was maintained, and when the receiver was placed in possession of the assets and affairs of the corporation he found the assets and liabilities of the guarantee stock and expense fund stated upon the books of the association entirely apart from and independently of the assets and liabilities of the series stock. A statement of those assets and liabilities is hereinabove given. See paragraph 4 of the finding of facts. From that statement it will be seen that the only liability of this fund to outsiders is an obligation of twenty-two thousand six hundred and eighty-five dollars and twelve cents due to the Hibernia National Bank, whilst the assets are given at one hundred and twenty-two thousand six hundred and eighty-five dollars and twelve cents ($122,685.12). As the office building cost over seventy-five thousand dollars within the past four years, I think it safe to assume that this fund is solvent, as to outside creditors, and that it is perfectly safe, upon this hearing, to ignore the outside creditors of this fund. I reach this conclusion even independently of the fact that the outside creditor the Hibernia National Bank holds obligations which upon their face are obligations of the guarantee stock and expense fund alone, and not of the association.

The receiver, in his petition, avers that he is informed that the holders of some of the guarantee stock claim the right to participate on the same terms with the holders of full-paid series stock in all the assets of the association, and that the distinction made between the two funds ceased to exist when the association ceased to be a going concern. In view of this statement in the petition of the receiver, I deem it well to state fully the rights of the guarantee stockholders under the charter. The charter of the association (article 7) expressly provides that to the guarantee stock shall belong and be attributed the entire stock and expense fund, and to the series stock shall belong and be attributed the entire series stock fund; that the two funds shall be kept entirely separate and distinct; and that neither fund shall have any part in or participate in earnings or proceeds of the other, except as expressly set out in the charter. The guarantee stock and expense fund is to consist of the amount subscribed to the guarantee stock, of certain other items named in the charter, and of ten cents per share per annum on each and every share of the series stock that is subscribed for, payable out of the monthly installments of seventy cents per share for series stock, whenever paid, and one dollar per share per annum from each and every share of the series stock, after it has been paid for in full, until such shares are liquidated. With the exception of the claims of ten cents per share per month, and one dollar per share per annum, last named, the guarantee stock has no claim whatsoever against the series stock fund, and the series stock fund has no claim whatsoever against the guarantee stock fund, except for the payment of the expenses of the association, expressly made payable out of the guarantee stock and expense fund. From these provisions of the charter, it seems to me perfectly clear that neither of the two funds has any claim whatsoever upon the assets of the other. True it is that whilst the association was a going concern the guarantee stock was entitled to a certain payment from the series stock; and so, on the other hand, the series stock was entitled, in consideration of these payments, to have all salaries, commissions, and compensation for services of

every kind paid out of the guarantee stock and expense fund. I do not deem it necessary for the purposes of this hearing to decide what effect the appointment of the receiver and the winding up of the association has upon the obligations of the series stock to pay the above-described monthly and annual dues to the guarantee stock and expense fund. nor what the effect of that winding up has upon the obligation of the guarantee stock and expense fund to pay the expenses of the association, for which that fund is liable under the charter. For the purposes of the present hearing it is sufficient to say that the guarantee stock and expense fund has no claim upon the assets of the series stock fund, and hence that the guarantee stock holders may be ignored entirely in considering the application of the receiver, which application seeks the advice of the court as to settlement to be made with borrowing stockholders, holding series stock, and liable as debtors to the series stock fund. My conclusion upon the whole of this branch of the case is that the guarantee stock fund may be entirely ignored, in considering the application of the receiver, and I do so ignore it.

### Rights and Obligations of Creditors and Stockholders of the Series Stock Fund.

(a) Creditors. The creditors of the association whose rights might be affected by any order to be rendered by the court upon the application of the receiver may be divided into bondholders, scrip holders, and sundry creditors. I shall first discuss the rights of the bondholders, and thereafter of all the other creditors together. The bondholders hold bonds of the association to the amount of one hundred and thirty-four thousand five hundred dollars ($134,500), upon which the interest accrued and to accrue up to June 30, 1900, amounts to an additional sum of thirteen thousand four hundred and eighty-five dollars ($13,485), thus making a total of one hundred and forty-seven thousand nine hundred and eighty-five dollars ($147,985). Under the agreements under which the Manhattan Trust Company and the American Trust & Banking Company were constituted trustees, and under which certain real estate securities of the New South Building & Loan Association were deposited with said trustees, it was expressly provided that the New South Building & Loan Association should have the right to withdraw any of the securities on deposit by it with the trustee of securities of equal amount and similar character, or upon deposit of one hundred dollars ($100) in cash for each one hundred and twenty-five dollars ($125) of said securities, or upon surrender and cancellation of the bond itself. In view of the fact that Judge Shelby, in his order directing the trustee to deliver to the receiver all the real estate securities which had been deposited with it as securities for the bonds of the association, directed that his decree should be without prejudice to, and with full reservation of, the rights of all parties, and especially of the holders of any bonds issued under either or any of the agreements in the order referred to, and reserving the rights of all parties in respect to the assets or securities transferred to the receiver, and in view of the further fact that the bondholders undoubtedly enjoy priority over all the stockholders of the association, and also over all other creditors upon the assets affected by the lien of the bonds. I believe that the wisest and most unobjectionable plan of settling with borrowing stockholders of the association, by compromise and amicable adjustment, without infringing upon the rights of the bondholders, would be to authorize and instruct the receiver to exercise the rights which the association itself possessed under the trust agreements; that is to say, to substitute one hundred dollars in cash for each and every one hundred and twenty-five dollars of securities which are affected by the lien of the trust agreements, and in reference to which the receiver may desire to effect a compromise with the debtors of the association. In view of the fact that the receiver has in his hands an amount of cash exceeding fifty thousand dollars ($50,000), this plan is perfectly feasible, and will prevent any possible injury or claim of injury to the bondholders. In order to show how this plan would work, the master submits the following example, assuming for the present that the suggestion of the receiver be adopted by the court, and that the receiver be authorized and instructed to allow borrowing stockholders thirty-five per cent. (35%) of the

book value of the stock as ascertained by the receiver; such allowance to be credited on the loan of the borrowing stockholder, and considered as an advance payment on account of the distributive share to accrue to the stock held by such borrower. If the borrowing stockholder, owing one hundred and twenty-five dollars ($125), upon a loan which has been deposited with the trustee for the benefit of the bondholders, should desire to settle with the receiver in the manner suggested by the receiver, he would be required to pay eighty-one dollars and twenty-five cents ($81.25),—that is to say, sixty-five per cent. (65%) of his indebtedness; the remaining thirty-five per cent. (35%) being allowed to him as an advance dividend upon his stock. The association, however, when it was a going concern, had no right to demand the return of the obligation in question to it, except upon deposit by it with the trustee of other securities to the amount of one hundred and twenty-five dollars ($125), or of one hundred dollars in cash. The receiver, succeeding to the rights of the association, would certainly have rights at least equal to those of the association, and could therefore demand possession of the notes or other papers given in evidence of the obligation of the borrowing stockholder, provided he should pay one hundred dollars ($100) to the trustee. The master suggests that the receiver exercise this right by depositing to his credit, as receiver in this cause, in the American Trust & Banking Company of Atlanta, Ga., pursuant to the order of Judge Shelby of date July 31, 1899, of all sums which may be received by him in amicable adjustment of any of the indebtedness pledged by the New South Building & Loan Association to the American Trust & Banking Company of Atlanta, Ga., as trustee, and by further depositing to his credit, as receiver in this cause, in said American Trust & Banking Company of Atlanta, Ga., such an amount as will, together with the amounts realized from the amicable adjustment of said indebtedness, make a total of one hundred dollars ($100) for every one hundred and twenty-five dollars ($125) of indebtedness adjusted. If this course be pursued, it is evident that no bondholder will have any right to complain, and the total amount of cash required to redeem a sufficient amount of securities to realize the total amount of the bonds and interest to June 30, 1900, would be twenty-seven thousand three hundred and seventy-seven dollars and twenty-three cents ($27,377.23). The master therefore finds that the plan of amicable adjustment with borrowing stockholders suggested by the receiver may be adopted without impairing or affecting any rights of bondholders, provided the receiver be instructed, whenever an adjustment is effected with any borrowing stockholder whose indebtedness to the association has been hypothecated with the trustee of the bonds, then and in that event to deposit with the American Trust & Banking Company of Atlanta, Ga., the proceeds of any such amicable adjustment, together with such an amount, to be taken from the general fund of the receiver, as will, together with the amount received from such amicable adjustment, make a total of one hundred dollars ($100) in cash for every one hundred and twenty-five dollars ($125) of hypothecated securities extinguished by amicable adjustment. The other class of creditors of the association to be considered are scrip holders. Inasmuch as these scrip holders are merely general creditors, having no hypothecary rights upon any of the securities of the association, the master finds that the court having the association before it as a defendant in this cause has the same right, through its receiver, to amicably adjust and compromise claims of the association, as the association itself would have had if it were still a going concern; and the master therefore finds that, if the adjustment suggested by the receiver be found by the court to be reasonable and fair, there is no reason why such adjustment should not be made, regardless of the existence of scrip holders of the association. What has been stated in reference to scrip holders is also applicable to the few other creditors of the association.

(b) Stockholders of Series Stock Fund. In discussing the rights of the various stockholders of this class, and the question whether or not the settlement proposed by the receiver is fair to the nonborrowing stockholders, at the same time that it lessens the burdens of the borrowing stockholders, it is important to note briefly the nature of this corporation, the rights and obligations resulting from the contract between borrowing members and the

association, and the effect of the dissolution of the corporation, or its equivalent, upon the duties of members and the obligations of borrowing members. There has been a very considerable number of cases bearing upon these questions, and there are at least two text-books which have been written upon the Law of Building Associations which discuss these subjects at length, to wit, Thompson on Building Associations and Endlich on Building Associations. From these books and from the authorities I think it safe to lay down the following brief statement of the law applicable in the premises, to wit: A building association is a private corporation for gain, formed for such time as may be permitted by the laws under which it is incorporated, for the accumulation, from fixed periodical contributions of its shareholders in payment of the stock subscribed by them, the penalties for their nonpayment, and the profits upon their investment, of a fund to be applied from time to time in accommodating such shareholders with loans or advancements, primarily for the purpose of acquiring the free possession of real estate or constructing dwellings, or both, under terms and regulations prescribed by law or by the charter and by-laws of the association, upon principles of strict mutuality and equality of benefits and obligations, with the effect of extinguishing the liability incurred for such loans and advancements simultaneously with the termination of the sharcholder's periodical contributions upon stock held by him in the association; the object of the latter being completed when the fund raised is sufficient to distribute to each member the par value of all shares subscribed by him, and held without loans, and to extinguish all loans held by shareholders. See End. Bldg. Ass'ns (2d Ed.) § 16. "When a member of a building association becomes a borrower, his original contract with the association, and that of the latter with him, together with the rights and obligations resulting therefrom to each, respectively, continue in force intact, except in such minor details, not affecting the membership of the borrower in which they may have been varied by the conditions of the new contracts entered into by both parties, whether expressed or implied. On the part of the borrower this new contract may, in general, be said to embrace the following essential features: (1) The member agrees to receive the advancement from the building association, and to allow it, for the privilege of the preference, a certain stipulated price, premium, or bonus. (2) He undertakes, and gives security in support of the undertaking, faithfully to perform, to the termination of the society's existence, or the running of a series, all the requirements of its constitution and by-laws relative to stock payments or dues, fines, and other charges upon and in respect of the shares held by him (which, as a rule, he pledges to the society as collateral security), and to be liable for and discharge all proper dues, assessments, contributions, and charges arising upon them in the same proportion and in the same manner as the rest of the members, and in addition to make a fixed periodical payment by way of interest on his loan, either by that name, or in the way of a stipulated increase in the regular dues corresponding with the interest upon the loan. (3) He agrees that upon the termination of the society, when its assets shall become distributable, it shall appropriate the proportion thereof accruing to such of his shares as were advanced to him to its own reimbursement and the payment of the premium bid, if the society runs its full course, or to its reimbursement merely if it be prematurely dissolved by reason of insolvency. (4) He agrees that in case of his failure at any time to perform the continuing conditions of his undertaking for a certain period, or for such remissness in the payment of dues, etc., as would be ground of forfeiture of his shares as a member, the society shall be absolved from the necessity of waiting until the period of dissolution for its payment, but shall have the right to demand and recover it from him at once, including in the debt not only the amount actually loaned, but all the payments and charges which may lawfully, under his obligation as member and borrower, be demanded from him, and also, in case of failure of the association and a winding up before its purposes are accomplished, to make settlement at once for what may be found due from him to it. The building association, in its turn, assumes certain corresponding obligations towards the borrower: (1) It agrees to perform, so far as he is concerned, the purposes of its incorporation, and to

permit him, so long as he does his share, to participate in the benefits and advantages of it. (2) It agrees to let him have the use of the money advanced during the continuance of the society's legal life or the running of a series, provided he lives up to the terms of his undertaking. (3) In the meanwhile it is to receive and invest the payments made by him, both as dues and as or in lieu of interest, in the same manner as those of other members, and as part of the common fund. (4) Finally, upon the winding up of the concern it is to account to him for.such proportion of the whole accumulation as may be coming to his share, retaining so much as may be necessary to .cover his proportionate share of the losses and expenses, and applying the balance to the liquidation of his debt, including the actual advance, interest, fines, and premium, according to his undertaking, and thereupon canceling his securities." See End. Bldg. Ass'ns (2d Ed.)· pp. 116–118. Upon the effect of dissolution or its equivalent upon membership duties and borrowers' obligations, Mr. Endlich states the law as follows: "A dissolution, strictly speaking, of the association, of course, at once putting an end to all its corporate business, terminates the liability of members to continue the prescribed regular stock payments. Where that dissolution occurs in the contemplated course of events, no serious question can arise as to its effect upon the rights or duties of any class of members. But where it occurs prematurely the case is different. For the purposes of discussion of the questions then arising, no distinction need be made between a dissolution properly and technically so called, and one practically resulting from the agreement of members or the insolvency of the association. In every case the effect upon the members is to stop at once any liability for further regular stock payments. And this applies equally whether such members be merely investors or also borrowers. 'The liability to pay monthly dues or fines, or interest on the amount advanced, cannot extend beyond the existence of the association.' And the reason is obvious. The advance made to the member by the building association is not a naked loan of money, to be returned dollar for dollar. Part of the consideration of the contract which the borrower entered into upon receiving the advance was the interest he retained as a member in the accumulations of its business, and the prospect, by means of this interest, to be enabled not only to lay by, through a long period of time, small sums towards the day of repayment, but also to enjoy during that period the profits which such small sums would, when the course of the society was completed, have earned, making his credit sufficient in bulk to be set off against his liability to the association and extinguish the same. The length of time thus allowed him for the extinguishment of his debt, and the additions with the aid of which his periodical payments, by being constantly employed in producing revenues (these revenues again being invested, and so on ad infinitum), would swell to the sum total of his obligations to the society, are material elements in preventing his undertaking as to premiums, fines, etc., from proving extremely oppressive, if not ruinous. The mode of payment, in other words, is an essential part of the contract. The dissolution of the building association necessarily puts an end not only to its capacity to receive from time to time his small payments, but also to the possibility of their being turned to account for his benefit by means of the system of investment and reinvestment peculiar to the building association scheme. The main feature which has made his undertaking bearable, and in reliance upon which he has been induced to assume its obligations, is thus taken away, and it follows as an inevitable consequence that he cannot be held to its precise terms. His duty to make regular stock payments (a duty incident to membership only) ceases; for the stock itself is destroyed, there being no longer a corporation as whose stock it can figure, and the membership dies with the corporation. So ·far as the mortgage was given to insure the performance. of this membership duty, the obligation is abrogated by the destruction of the stock and the society. The imposition of fines (a species of liquidated damages due the society, under its system of mutuality, for the neglect of a membership duty) must of necessity fall away when the membership is gone,—when there is none who can justly claim the damages, and when their exaction would be nothing more nor less than the enforcement of penalties not countenanced by the law. The agree-

ment to pay a premium for the loan, justified upon the basis of strict mutuality, and bearable by reason of the length of time allowed for its liquidation, and by the fact that it would, according to the status and intent of the contract when entered into, be in part made up by profits upon the stock payments and interest discharged by the borrower during the projected continuance of the association, as well as by similar payments made by other borrowers during the like period, and the gains and accumulations of the entire corporate business to the day of its contemplated termination, must, when that mutuality is taken away, and all the other elements embraced in the terms of its assumption removed, fail for want of a proper consideration. At least, it fails in part. The duty of the borrower, as a member, ratably to contribute to the debts and losses of the corporation, remains. That arises on considerations independent of those relating to his indebtedness, but, as has been seen, it is enforceable under and by means of the obligation given by him as a debtor. In endeavoring to formulate a rule which shall do exact justice to all the parties, in view of the considerations stated, the courts have not arrived at altogether uniform results. On one point there seems to be a general concensus, although the distinct enunciation of the principle is only of very recent date. It is this: That upon premature dissolution of the association the advanced members may be compelled to pay forthwith the balances due from them on their securities, although the latter be given in terms only for the payment of installments. Just how those balances are to be made up, however, is a question upon which there has been a diversity of opinion." See End. Bldg. Ass'ns (2d Ed.) pp. 515–519. After stating the law as above, Mr. Endlich lists the cases showing the different views which have been expressed by different courts. I deem it unnecessary to state the results reached by different courts in different cases, but respectfully submit that as satisfactory and clear a statement of the principle which should apply in this case as can be found anywhere is given by Judge Grosscup in the case of Towle v. Society (C. C.) 61 Fed. 446. In that case Judge Grosscup says: "The question reduces itself to one of simple equity and fair play. The inability of the association to proceed to its expected termination by reason of the impairment of its collectible loans is attributable alike to each stockholder. The officers of the association are their agents, and the results of their investments are alike the fortune or misfortune of each stockholder, whether it be borrower or nonborrower. When a condition thus brought about justifies a court of equity in peremptorily terminating the career of the association, the adjustment should be made as near upon the line of what would take place if the association lived out its life as possible. I can think of no fairer rule than to regard the normal life of the association as eight years, and to look upon each year short of that period as an aliquot portion thereof. This would give the borrower credit for such premium as the number of years, or fractional parts thereof, unlived by the association, bear to the whole period of its normal life of eight years. To that extent the premium is unearned. For the period already past it has been earned. It is true that the borrower might not have bid the premium if he had foreseen the premature death of the association; but neither would his fellow stockholders, with a like foreknowledge, have contributed their installments. The misfortune of the one is not greater than that of the other. If the borrower were to be credited with the entire premium, the taking of possession of the assets by a court of equity would immediately reduce the already impaired assets by the amount of the aggregate premiums. It might easily be that the intervention of equity near the close of the eight years' would, under such circumstances, be a positive boon to the borrower, by incidentally deducting from the loan a large percentage of the principal. The temptation and uncertainty thus introduced ought, if possible, to be averted."

I believe that the above general statement of the law applicable to this case is sufficient for the purposes of the present application. It may, however, be well at this point to state that the question whether or not the premium charged by a building association upon the loan to one of its members is to be considered as in the nature of an additional interest, affecting the whole transaction with a taint of usury, is one upon which there is a

wide divergence of judicial opinion. The decisions upon this subject are carefully listed and analyzed by Mr. Endlich in his work from which we have already quoted (2d Ed. pp. 292–327). After reviewing all the authorities, he reaches a conclusion which I believe to be correct, and as follows: "An examination of the foregoing decisions would seem to justify the conclusion that the clear weight of judicial authority declines to look upon the transaction between a building association and its advanced member as constituting a loan, pure and simple. At the same time the conflict between those decisions emphasizes the impossibility of declaring that transaction a mere dealing in partnership funds, to the total exclusion of the idea of a loan. The truth can lie in neither of the extremes represented. It may perhaps be found most nearly accurate to say that the transaction is a loan, the terms of which are so vitally affected by the debtor's membership relation to the creditor society, in the source and profits of which the debtor has himself such a substantial interest, and the extent of his ultimate liability upon which is so contingent and uncertain at the time of its creation, that it is impossible to apply to it, in its essential features, the rules of common or statute law defining the limits of what may be bindingly assumed and lawfully exacted in ordinary transactions of borrowing and lending." For the purposes of this hearing, I may add that the supreme court of Louisiana has aligned itself with those courts holding that the premium is not to be considered as affecting the contract with usury. In Homestead Co. v. Linigan, 46 La. Ann. 1118, 15 South. 369 et seq., the court (page 1129, 46 La. Ann., and page 373, 15 South.), says, "There was from the first an element of uncertainty in the contract, excluding questions of an exclusive loan and usury." To the same effect is the case of Richard v. Association, 49 La. Ann. 481, 21 South. 643. It should also be borne in mind that every contract made by this association with its borrowers expressly provided that all moneys due from stockholder to the association, or due from the association to the stockholder, should be ·due and payable at the home office, New Orleans, La. This clause, under general principles of law, unquestionably made the contract a Louisiana contract, governed by the laws of the state of Louisiana on the subject of usury. If express authority be required to sustain this proposition, I need only refer to the case of Andruss v. Association, 36 C. C. A. 336, 94 Fed. 575, where the court of appeals for this circuit expressly held, through Judge Shelby as its organ, that contracts of this character are not usurious, if valid under the laws of the place of performance. I therefore conclude that none of the contracts of this association with its borrowing stockholders are tainted with usury. This conclusion is assumed by the receiver to be correct in the tableau which he has prepared, showing the state of the accounts between the association and each and every one of its stockholders. Even if this conclusion should perchance be incorrect, it would follow that the settlement by borrowing stockholders of their indebtedness upon the terms proposed by the receiver would be all the more advisable, in the interest of the trust fund in the hands of the court. The receiver has, in the document marked "Receiver 42," given the amounts due by each and every stockholder to the association, or by the association to such stockholders, and he has explained in his testimony the method adopted by him in stating the accounts between stockholders and the association, which method I believe to be fair and equitable, and to fully conform to the views expressed by Judge Grosscup as to the general principles to be followed in winding up associations similar to the one before the court. I therefore find, as my conclusion of law in the premises, and practically in the language of Judge Grosscup, that the question in this case is one of simple equity and fair play. The inability of the association to proceed to its expected termination, by reason of the impairment of its collectible loans, is attributable alike to each stockholder. The officers' of the association are their agents, and the results of their investments are alike the fortune or misfortune of each stockholder, whether he be borrower or nonborrower. This condition justifies this court, as a court of equity, in peremptorily terminating the career of the association, and in adjusting the relative rights of the various persons interested upon the most equitable basis attainable; that is to say, by ascertaining and fixing the amount now due by each and

every borrowing stockholder to the association, including in the amount borrowed by such stockholder all installments due by him upon his stock, all interest due upon loans, all premiums, insurance, taxes, or other charges and expenses due and equitably chargeable to such stockholder at the date when the receiver was appointed; by further ascertaining the amount of the distributive share of such stockholder in the assets of the association; and by demanding from all of the stockholders of the association who may, under an adjustment of accounts upon the basis aforesaid, appear to be debtors of the association, the amount due by them, and paying to all stockholders who, as the result of such an adjustment of accounts, may be creditors of the association, the amounts due to them. It is evident, however, that the distributive share of the stockholders in the assets of the association cannot for the present be definitely and finally fixed, as it must be affected by the successful or nonsuccessful administration of the receivership in this cause. In view, however, of the expense, delays, and annoyance of litigation, as also the expense of administering and disposing of the real estate mortgaged to the association, in the event that foreclosure should become necessary, I deem it unquestionably wise and politic to allow borrowing stockholders to settle their indebtedness to the association at the figures due by them, and as calculated by the receiver in the tableau filed by him, and marked "Receiver 42," first crediting the amount so due with a dividend of thirty-five per cent. (35%) upon the value of the certificate or certificates of stock held by such stockholder or stockholders, which value is also shown in said document "Receiver 42." I need not add that this recommendation applies only to those stockholders who may settle their accounts upon the basis suggested without litigation, and within a reasonable delay. As to stockholders who may resist the claims of the receiver, and who may not by prompt payment justify concessions, there is neither any legal nor equitable justification for any action by this honorable court entitling them to a dividend out of the assets of the association, except in due course of administration, and at the same time that nonborrowing stockholders receive their dividends. The general views above announced will be more clearly and exactly stated in the draft of order hereinafter given.

In conclusion, I respectfully recommend that this honorable court do, after due proceedings had, enter an order in this cause substantially as follows: The receiver in this cause is hereby authorized and instructed to deal with borrowing members of the defendant association at this stage of the proceedings as follows, to wit: First. He shall at once demand of all borrowing stockholders of the association the amounts due by them to the association for installments, interest, premiums, insurance, taxes, and any other charges and expenses, as per tableau prepared by the receiver, and marked "Receiver 42," filed in this cause on the 16th day of February, 1900, with the master's report, also filed on said day; and he shall accompany his demand with a copy of this order. Second. To all borrowing stockholders who shall, within sixty days after the date when said notice shall have been mailed or delivered to them, adjust and settle in cash their indebtedness to the association, the said receiver shall allow a credit to be imputed upon said indebtedness of thirty-five per cent. (35%) of the value of the certificate or certificates of stock owned by such borrowing stockholders, as per said tableau marked "Receiver 42," as aforesaid; said allowance or dividend of thirty-five per cent. (35%) being allowed to such stockholders as may so amicably adjust their indebtedness to the association in anticipation of the distributive share which may ultimately come to them as stockholders. Upon the payment of their indebtedness by borrowing members upon the basis aforesaid, all indebtedness of such borrowing members to the association shall be canceled and extinguished, and all notes or other securities of such stockholders held by the receiver shall be surrendered to them, but said stockholders shall retain their right to participate in any distribution of the assets of the association after a like dividend of thirty-five per cent. (35%) of the book value of the stock shall first have been paid to all other stockholders. Third. The said receiver is hereby authorized and instructed immediately after the expiration of said term of sixty days allowed to said borrowing stockholders to avail themselves of the method of amicable adjustment and

settlement aforesaid to proceed by foreclosure or other proceedings to collect all amounts due from borrowing stockholders who shall have failed to avail themselves of said offer; and said receiver is hereby authorized to employ all counsel necessary, and to incur all expenses necessary, for the purpose of collecting the claims due by said borrowing stockholders. The said borrowing stockholders against whom it may be necessary to institute any legal proceedings shall not be entitled to any advance payment on account of the distributive share of the stock held by them, but shall await a distribution of the assets of the association in due course of administration by this court. The court, however, reserves the right of separately considering and acting upon the case of any borrowing stockholder or stockholders who may not accept the adjustment of accounts between themselves and the association within said sixty days, and of rendering such order in each case as may be legal and equitable. Fourth. Whenever the receiver adjusts any of the indebtedness pledged by the New South Building & Loan Association to the American Trust & Banking Company of Atlanta, Georgia, as trustee, and in accordance with the terms of this order, he shall deposit to his credit, as receiver in this cause, in said American Trust & Banking Company of Atlanta, Ga., all sums which may be received by him in amicable adjustment of any such indebtedness, together with such further amount as will, together with the amounts realized from the amicable adjustment of said indebtedness, make a total of one hundred dollars ($100) for every one hundred and twenty-five dollars ($125) of indebtedness adjusted. It is further ordered that all costs of these proceedings be taxed against the trust fund in the hands of the receiver in this cause.

All of which is respectfully submitted.

The foregoing report was by the master submitted to all of the parties who appeared at the hearing before him, to wit, to the complainant and to the receiver, through Joseph P. Blair, Esq., their solicitor, who filed no exceptions to said report with the master, and to Mrs. Nonie M. Chase, through Solomon Wolff, Esq., her solicitor, who filed exceptions to said report with the master, which exceptions are, with this report, returned into court.

Jos. P. Blair, for complainant and the receiver.

Solomon Wolff, for Nonie M. Chase, a borrowing stockholder.

Decree upon the Report of Special Master E. B. Kruttschnitt, Filed Herein on February 16, 1900.

PARLANGE, District Judge. This cause having come on to be heard at this term upon the report of E. B. KRUTTSCHNITT, Esq., appointed special master in this cause, to whom was referred the petition of Johnston Armstrong, receiver herein, filed on October 25, 1899, by order of reference herein entered on October 31, 1899, and upon the petition of the said receiver to confirm said report, and upon the exceptions of said report by Mrs. Nonie M. Chase, a borrowing stockholder of the defendant association, and was argued by counsel, and thereupon, upon consideration thereof, it is now ordered, adjudged, and decreed that the report of said special master be, and it is hereby, approved and confirmed, except as to the form of the order recommended by the said master, which is modified as hereinafter provided. It is accordingly ordered, adjudged, and decreed that the receiver in this cause is hereby authorized and instructed to deal with borrowing members of the defendant association at this stage of the proceedings as follows, to wit: First. He shall at once demand of all borrowing stockholders of the association the amounts due by them to the association for installments, interest, premiums,

insurance, taxes, and any other charges and expenses, as per tableau prepared by the receiver, and marked "Receiver 42," filed in this cause on the 16th day of February, 1900, with the master's report, also filed on said day, with further stipulated interest on the amount borrowed until paid or settled as herein provided; and he shall accompany his demand with a copy of this order. Second. To all borrowing stockholders who shall, within 60 days after the date when said notice shall have been mailed or delivered to them, adjust and settle in cash their indebtedness to the association, the said receiver shall allow a credit to be imputed upon said indebtedness of 35 per cent. of the value of the certificate or certificates of stock owned by such borrowing stockholders, as per said tableau marked "Receiver 42" as aforesaid; said allowance or dividends of 35 per cent. being allowed to such stockholders as may so amicably adjust their indebtedness to the association in anticipation of the distributive share which may ultimately come to them as stockholders. Upon the payment of their indebtedness by borrowing members upon the basis aforesaid, all indebtedness of such borrowing members to the association shall be canceled and extinguished, and all notes or other securities of such stockholders held by the receiver shall be surrendered to them; but said stockholders shall retain their right to participate in any distribution of the assets of the association after a like dividend of 35 per cent. of the book value of the stock shall first have been paid to all other stockholders: provided, however, that each borrowing member so receiving said anticipatory dividend shall thereby obligate himself to return to the receiver, on demand, any excess of said dividend over the amount of dividend which on final liquidation shall be found to be due to the stockholders of the said association. Third. The said receiver is hereby authorized and instructed, immediately after the expiration of said term of 60 days allowed to said borrowing stockholders to avail themselves of the method of amicable adjustment and settlement aforesaid, to proceed by foreclosure or other proceedings to collect all amounts due from borrowing stockholders who shall have failed to avail themselves of said offer; and said receiver is hereby authorized to employ all counsel necessary and to incur all expenses necessary for the purposes of collecting the claims due by said borrowing stockholders. The said borrowing stockholders against whom it may be necessary to institute any legal proceedings shall not be entitled to any advance payment on account of the distributive share of the stock held by them, but shall await a distribution of the assets of the association in due course of administration by this court. The court, however, reserves the right of separately considering and acting upon the case of any borrowing stockholder or stockholders who may not accept the adjustment of accounts between themselves and the association within 60 days, and of rendering such order in each case as may be legal and equitable. Fourth. Whenever the receiver adjusts any of the indebtedness pledged by the New South Building & Loan Association to the American Trust & Banking Company of Atlanta, Ga., as trustee, and in accordance with the terms of this order, he shall deposit to his credit, as receiver in this

cause, in said American Trust & Banking Company of Atlanta, Ga., all sums which may be received by him in amicable adjustment of any such indebtedness, together with such further amount as will, together with the amounts realized from the amicable adjustment of said indebtedness, make a total of $100 for every $125 of indebtedness adjusted. It is further ordered that all costs of these proceedings be taxed against the trust fund in the hands of the receiver in this cause.