DOUGLASS v. KAVANAUGH et al. GIBBS et al. v. DOUGLASS et al. KAVANAUGH et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

Nos. 589–591.

**1.** BUILDING AND LOAN ASSOCIATIONS—USURY—STATUTE OF TENNESSEE.
Under the Tennessee statute governing building and loan associations, which permits associations formed thereunder to sell their loans, in open meetings, to the stockholder bidding the highest premium, which premium is not to be considered as interest, within the general usury law, it is only a premium bid in open competition which is lawful; and where an association made its loans privately, without such competition, exacting a fixed premium, whether determined by its by-laws or in disregard of their provisions, such premium renders its loans usurious.

**2.** SAME—INSOLVENCY—BASIS OF SETTLEMENT WITH BORROWING STOCKHOLDERS.
On the insolvency of an association, the proper basis of settlement with borrowing stockholders is that which maintains the distinction between them as stockholders and as borrowers, by applying sums paid as dues on their stock; thus placing them on the same footing as nonborrowing members, and crediting payments of premium and interest on the loans. Where illegal premiums were exacted, which render the loans usurious, the borrowers should be charged with the sum actually received, and credited with payments made of premiums and interest as of the date when paid.

**3.** SAME—RECOVERY OF USURY PAID.
A stockholder, who was also a borrower, in a building and loan association which exacted illegal and usurious premiums from its borrowers, who settled up his loan while the association was solvent by paying the amount due thereon after receiving credit, not only for his payments, but also for the accrued profit on his stock, made up largely of such illegal premiums, or one who suffered foreclosure and also received credit for such profits, cannot, after the association has become insolvent, recover back the usurious premiums paid by him, as against the remaining stockholders, and at the same time retain the illegal profits he has received; but a stockholder who has repaid his loan, but still retains his stock, and who received no credit for such illegal gains, may recover the usury paid, under a statute permitting such recovery.

**4.** SAME—ILLEGAL ISSUE OF STOCK—RIGHTS OF HOLDERS.
The issue of more shares of stock to one person than is permitted by the charter of the association is not in itself fraudulent, and the holders of such excess stock at any time before the contract has been executed by full payment are entitled to rescind and recover the amounts paid thereon; and where before that time the association becomes insolvent, and its affairs are liquidated, and the share of its assets accruing to such stock does not exceed the amount paid thereon, other stockholders cannot complain that the court, to save expense, and for convenience, permits the stock to share in such assets.

Cross Appeals from the Circuit Court of the United States for the Eastern District of Tennessee.

Harry H. Ingersoll, for W. F. Gibbs and John P. Kavanaugh.

R. H. Sansom, for A. J. Douglass.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge. These three appeals have been heard together, and are appeals from the final decree in a stockholders' suit filed for the purpose of winding up an insolvent Tennessee building and loan association. A number of errors have been assigned upon the final decree: (1) By the receiver, who has appealed from so much of the decree as held the loans made by the association to its stockholders to have been usurious, and from so much thereof as settles the basis upon which the indebtedness of such borrowers was adjusted. (2) By certain usury claimants, who have intervened to recover usury paid by them upon loans which were either voluntarily or involuntarily adjusted and closed while the association was a solvent and going concern. (3) By certain individual stockholders, who excepted to the participation of certain alleged illegal or overissue shares in the distribution of assets, and who have appealed because their exceptions were overruled, and the alleged unlawful shares suffered to participate with legal shares in the distribution of assets. We shall dispose of these questions in the order stated.

1. The receiver's exception was properly overruled. The loans made by the association were not in accord with the terms of the charter, and were clearly usurious. The general law of the state provided that no interest in excess of 6 per cent. should be lawful. This association was incorporated under another general law of the state, providing for the organization of building and loan associations. That general law permitted such companies to lend their money to stockholders at a rate not exceeding the lawful rate of 6 per cent. per annum, but also provided that all such loans shall be made by the directors, at stated times and in open meeting, to the stockholder who should bid the highest premium. This charter law contemplated that this premium should be a bonus paid, "not as interest, but as a means of determining which one of the shareholders shall receive the loan whenever there are a number of stockholders who may simultaneously desire to effect a loan." Laws 1875, c. 142, § 14. The effect of this charter provision was to modify the interest laws of the state, and to legalize the taking of such a "bonus" or "premium," when paid, as a result of the free and open competition of bidders, at a sale of the money of such an association, in the mode and manner provided by the law of organization. This was the construction and meaning put upon the statute authorizing the incorporation of such companies in the leading case of Patterson v. Association, 14 Lea, 689. In the subsequent case of Post v. Association, 97 Tenn. 408, 37 S. W. 216, this case was followed, and the necessity of strictly following the charter method of making loans was emphasized in a remarkably strong

and able opinion by Mr. Justice Wilkes. In that case it appeared that the loans of the association were made, not at open and free sales, and that the premiums were not the highest bonus bid at such a sale, but were settled by a by-law which provided that no premium should be received in excess of 30 per cent. or less than $29\frac{7}{8}$ per cent. That case must be taken as deciding that whenever the premium received for a loan was not the result of a free and competitive sale, but was fixed by mere agreement of the parties or by-law of the association, the loan would be usurious, and the premium an illegal exaction. "A premium, in order to be lawful," said Justice Wilkes, "must be one that is bid for the right of precedence in taking a loan at a competitive sale; and when there is no such sale, and no bid, there can be no lawful premium." The special master to whom the subject was referred reported that the Savings Building & Loan Association had not followed the charter method of making loans, but had adopted a uniform or level premium of 50 per cent. The evidence did not show that this result was reached by a by-law, as in Post v. Association, supra. The means for securing the same result were quite as efficient, however. Moneys were never sold in open meeting and upon free competition. The practice was to apply to the secretary for a loan, who would inform them that the custom or practice was to authorize him to make a bid of 50 per cent. This grew into the common law of the association, and the proof was that the invariable bid was 50 per cent., and that for years no loan was made at any other than this enormous premium. The loan was awarded, not to the highest bidder at a sale, but to the bidder whose security was most satisfactory. This method was not in accordance with the charter power. There was no sale, no competitive bidding. The premium was not paid for precedence in obtaining a loan, but as a part of the price demanded by the lender from the borrower. The practice was in open and flagrant violation of the organic law of the corporation, and premiums thus obtained were an unlawful exaction. The association is now insolvent. Nonborrowing stockholders cannot be repaid in full, and the assets must be ratably divided. What shall be the basis of settlement with borrowing stockholders? The rule adopted by the master and affirmed by the circuit court was that approved in Rogers v. Hargo, 92 Tenn. 35, 20 S. W. 430; Post v. Association, 97 Tenn. 408, 37 S. W. 216; Strohen v. Association, 115 Pa. St. 273, 8 Atl. 843; and by End. Bldg. Ass'ns (2d Ed.) §§ 514, 515. That rule maintains the distinction between the stockholder as such, and the stockholder as a borrower. It charges him, as a borrower, with the money he actually received, with interest from its receipt, and credits him with all payments of premium and interest as of the date when paid. He is not allowed credit for the payments of dues upon his stock. With reference to his stock payments, he is treated as if a nonborrower, and the fund remaining after all prior liabilities are paid is distributed pro rata among stockholders upon the basis of the amounts paid by them, respectively, as dues, whether borrowers or not. We did not consider the question as to what proportion of a premium paid in advance should be

returned when the company ceases to do business before maturity of the stock of the borrower. That question could only arise if the premium was one lawfully exacted. The premiums taken by this association were not lawfully taken, and must therefore be credited against the loan.

2. Were the intervening usury claimants entitled to recover usurious premiums paid by them? These appellants may be divided into two or more subclasses. We shall first dispose of those who, while the corporation was solvent and going, voluntarily paid off their loans by paying the balance due after applying as a credit thereon the then full withdrawal value of the shares upon which the loan had been made. The withdrawal value of stock thus canceled was ascertained according to the by-law which permitted a stockholder who was a borrower to receive the value of his stock as a credit on his loan, upon paying the balance due. That withdrawal value was made up of two items,—dues paid on the particular shares, and the distributive share of the profits of the association due to such stock. The profits included the unlawful gains taken from the whole class of borrowers. These settlements were made when the capital had not been impaired, and thus such settlements involved the return to the shareholder of all dues paid on his shares, as well as a proportion of the supposed gains of the association. It now turns out that the gains were for the most part unlawful, and the company is insolvent. Those who remained to the end will receive no gains, and but a pro rata of the stock dues paid in. These petitioners propose to hold on to all they received in their settlement, and recover in addition the premiums paid on their loans. They do not offer to open up the settlement made, but stand on section 1955 of Code Tenn. 1858, which provides that one who has paid usury may, in an action, recover it from him who received it. This statutory right of action is by no means conclusive as to the remedy of these interveners. This is a court of equity. This association is insolvent. If petitioners stood upon the footing of judgment creditors for usury paid, it would still be the duty of this court to marshal the assets, and determine the equitable right of such a creditor to share in the assets. The question is whether such claimants shall be suffered to inquire into the amount of usury paid by them, without opening up the settlement heretofore made, so that they shall stand, as withdrawing stockholders, upon an equal footing with those who remained. Equity is equality. These claimants have settled and adjusted their relations, and received the benefit of unlawful gains through usurious premiums. They cannot hold with one hand to the results of that settlement, and reach out the other for a further dividend at the expense of shareholders who will suffer a greater loss pro rata than petitioners. They must account for what they received. This they do not propose to do. They were properly repelled. This was in accord with Loan Ass'n v. Woods, 42 S. W. 872,—a case decided by the supreme court of Tennessee pending this suit, and not yet officially reported. The appellants of this class, who made default and suffered foreclosure, and now sue to recover usury, are in substantially the same situation as

those just disposed of. They received a credit upon their loans of the then full withdrawal value of the shares upon which their loans were made. This credit, having been received when the company was solvent, gave them back all their dues and a proportion of the profits, including usurious premiums. They submitted to this mode of adjusting their relation as borrowing shareholders, and should not be permitted to repudiate that settlement, except by offering to do equity, and returning that which they received, thus placing themselves upon an equality with those in a less fortunate situation. In McCauley v. Association, 97 Tenn. 421, 37 S. W. 212, the borrower did not assent to or accept the credit placed against his loan. He demanded that the premium exacted should be also credited, and sought to enjoin foreclosure. The class of borrowers with which we are dealing here accepted the credit, which included a share in the profits, and did not demand a further credit for the illegally exacted premium. They submitted to a foreclosure for the balance due, ascertained through an adjustment made according to the by-laws of the corporation. The corporation is now insolvent, and the rights of stockholders among themselves make it inequitable that these borrowers shall reopen a settlement thus made, which involved both the relation of borrower and stockholder, without doing equity. Adkins and wife are in a different situation. They borrowed and paid off their loan without receiving any credit for the withdrawal of the shares upon which they borrowed. They are still stockholders in respect to those shares. Not having participated in any unlawful gains, nor made any settlement involving such gains, they are free to present their claim as creditors, to the extent of the premium actually paid by them. The decree will be reversed as to them.

3. The last question is as to the attitude of certain shares, presented for participation in the assets, supposed to have been illegally issued. The charter provides that "no one person shall hold more than 50 shares of stock." Laws 1875, c. 142, § 14. It now appears that several persons were permitted to subscribe for more than 50 shares. The right of such excess shares to participate in the distribution of the assets was challenged by an exception taken to the master's report by a few individual stockholders, who claimed the right to protect the common fund by excepting to any claim they should deem improper. Neither the corporation nor the receiver made objection to these excess shares. This was doubtless due to a ruling made by the court which convinced them that it was not to the general interest of the corporation, its creditors or shareholders, to make technical objections to the report in respect to these shares. That ruling came about in this way: The holders of these excess shares applied to the court for leave to so amend their several intervening petitions as to aver their ignorance of the inhibition in the charter in respect to the holding of shares, and to pray that the contract of subscription be canceled, and their installments paid on such stock be returned to them. This leave was denied; the court ruling that, without formal pleadings, he would permit them to recover their payments on this stock, if it should be found

that they could not share otherwise in the assets. When the exceptions to the master's report came on to be heard, they were overruled, as having no real merit. If these holders of excess shares were entitled to recover their several payments to the corporation, the appealing stockholders are not injured by the decree appealed from. The recovery allowed will not diminish the common fund beyond that recoverable out of that fund upon the footing of creditors. · There was no limitation in the charter as to the number of shares that might be issued. The limitation was upon the number which might be held by one person. This limitation would make it illegal for the corporation to receive a subscription for more than 50 shares by the same person. This excessive subscription was not malum in se. It was, however, malum prohibitum. This distinction is important only in respect to the right of such subscriber to rescind the unlawful contract, and sue to recover that which he had paid in part performance thereof. This was an unexecuted contract. The contract was to pay for the shares in monthly installments, called "dues," until paid for. The payment was but partially completed when the company ceased to do business. While the contract was unexecuted there remained a locus pœnitentiæ. The delictum was incomplete, and either party might rescind the contract. The doctrine as stated in 2 Com. Cont. 361, and adopted by the supreme court as a sound statement of the law in Spring Co. v. Knowlton, 103 U. S. 49–58, is this:

"Where money has been paid upon an illegal contract, it is a general rule that if the contract be executed, and both parties are in pari delicto, neither of them can recover from the other the money so paid; but if the contract continues executory, and the party paying the money be desirous of rescinding it, he may do so, and recover back by action of indebitatus assumpsit for money had and received. And this distinction is taken in the books, that, where the action is in affirmance of an illegal contract, the object of which is to enforce the performance of an engagement prohibited by law, clearly such an action can in no case be maintained; but where the action proceeds in disaffirmance of such a contract, and, instead of endeavoring to enforce it, presumes it to be void, and seeks to prevent the defendant from retaining the benefit which he derived from an unlawful act, then it is consonant to the spirit and policy of the law that the plaintiff should recover."

This doctrine was applied in the case of Spring Co. v. Knowlton, supra; and a subscriber who had paid one installment upon an issue of illegal increase stock was permitted to recover the money paid, though before rescission his subscription had been forfeited for default in payment of subsequent installments. In that case the court, through Mr. Justice Woods, said:

"It is to be observed that the making of the illegal contract was malum prohibitum, not malum in se. There is no moral turpitude in such a contract, nor is it of itself fraudulent, however much it may afford facilities for fraud."

The doctrine in this case finds further illustration and application in Thomas v. City of Richmond, 12 Wall. 349; Hitchcock v. Galveston, 96 U. S. 341; Louisiana v. Wood, 102 U. S. 294; Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24–57 et seq., 11 Sup. Ct. 478; Ohio Life Ins. & Trust Co. v. Merchants' Ins. & Trust Co., 11 Humph. 1; and Andrews Bros. Co. v. Youngstown Coke Co., 30 C. C. A. 293, 86 Fed. 585, 596.

Technically, these holders of excess shares could not obtain a standing as shareholders; and it would have been better practice to have suffered them to file their amended petitions, rescind the contract, and assert their claims as creditors. To save delay and costs, this was not done. The appellants who interposed the exceptions which raised the question are not in an attitude to demand a reversal by reason of the technical objection that as stockholders they were not entitled to a standing. The decree does not affect any substantial right of appellants. To reverse, and allow amended petitions and a recovery of installments paid on these excess shares, would cost the fund more than the pro rata these shares will receive under the decree. There is therefore no merit in this assignment of error, especially as the great body of beneficiaries are content. The decree will in all respects be affirmed, save as to Adkins and wife. As to them it is reversed. The receiver will pay the costs of appeal in 589. The costs in the other cases will be paid by the appellants, except Adkins and wife.