## COOPER v. NEWTON.

(Circuit Court, S. D. Georgia, N. E. D.   February 3, 1908.)

1. COURTS—FEDERAL COURTS—ANCILLARY JURISDICTION—AMOUNT IN CONTROVERSY.

Where a federal court had jurisdiction of proceedings for the dissolution of a building and loan association, it had jurisdiction of an ancillary suit by the association's receiver for an accounting and foreclosure of a deed made to secure a loan to a borrowing member, though the amount due was less than $2,000.

[Ed. Note.—For cases point, see Cent. Dig. vol. 13, Courts, §§ 799–801.

Supplementary and ancillary proceedings and relief in federal courts, see note to Bedford Quarries Co. v. Thomlinson, 36 C. C. A. 276.]

2. BUILDING AND LOAN ASSOCIATIONS—BORROWING MEMBERS—CONTRACTS—CONSTRUCTION—"LOAN"—"INSTALLMENTS."

Where the note of a borrowing member of a building and loan association contained the words "monthly installments on said share," but no reference indicated an agreement to apply such installments on the member's loan, and the deed to secure the loan was conditioned on the payment of the "loan" and of "installments on certain shares," referring to the principal debt covered by the note both as a "loan upon 18 membership shares," the terms "loan" and "installments" were not used synonymously.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 8, Building and Loan Associations, §§ 61, 62.

For other definitions, see Words and Phrases, vol. 5, pp. 4196–4200.]

3. SAME—INSOLVENCY—SETTLEMENT—APPLICATION OF PAYMENTS.

Intestate subscribed for $900 of the stock of a building and loan association, and at the same time obtained by a pledge of the stock a loan equal to the par value thereof, giving a deed to certain real estate as security for the loan. She also agreed to pay interest at 5 per cent. and 5 per cent. premium, the note providing for monthly payments of 5 per cent. per annum, and containing an assignment of the shares of stock as security for the payment "of the monthly installments of said shares, interest and premium required," and, in case of default in the payment of such installments, interest, premiums, or fines for a period of three months, the association might forfeit the shares.  Held, that the contract for the purchase of the shares was distinct from the loan, so that, on the association's insolvency, intestate's administrator was not entitled to have all intestate's payments on her share apply in payment of the loan.

4. SAME—ACCOUNTING—BILL.

Where a bill by a receiver of a building and loan association for an accounting against the administrator of a borrowing member showed an indebtedness with interest and premiums due on October, 1902, of $1,605, on which indebtedness the payment of monthly installments of interest and premiums together amounted only to $1,267.50, the bill sufficiently showed an indebtedness to the association, regardless of the question of the application of payments.

In Equity.

Ellis, Wimbish & Ellis and William H. Barrett, for complainant.
W. K. Miller and Salem Dutcher, for defendant.

SPEER, District Judge.   The questions here arise upon a demurrer to a bill in equity by the receiver of the Southern Building & Loan Association against the administrator of Mary F. Butts, deceased.   Original proceedings for the dissolution of the association were filed in the Northern District of Alabama, and, shortly after, an

ancillary bill was brought in this court, and the receiver under the original bill was reappointed for the collection of assets in this district. This bill is for an accounting against the estate of the decedent "on account of a loan, or advance made by said association to her, a member of said association, holding eighteen shares" of its capital stock. Mary F. Butts, it is alleged, on December 21, 1894, subscribed for 18 shares of capital stock, of the par value of $50 each, and on the same date also made application to the directors of the association "for a loan or advance" of $900, offering to pledge as security her shares of stock and the real estate which the receiver now seeks to subject. The loan was made, and on March 1, 1895, was consummated by the decedent's execution of a bond or promissory note, and a deed to secure the same. The note was made payable at the office of the association in Huntsville, Ala. It provided for monthly payments at 5 per cent. per annum, and assigned the shares of stock as security for the payment "of the monthly installments on said shares, interest and premium required." In case of "default in the payment of said installments, interests, premiums, or fines" for a period of three months, it was further stipulated that the association might cancel and forfeit the shares. The bill further alleges that the testatrix on this indebtedness "paid 33 monthly installments on account of the dues on her said shares, amounting to $5.40 each, being 30 cents per month on each of the 18 shares represented by certificate No. 11,005 issued by said association, the first of said payments covering for the month of February, 1895, and the last covering for the month of October, 1897"; that, in addition, she "made 61 payments of monthly dues, amounting to $6.30 each, being 35 cents per month on each of the 18 shares represented by said certificate No. 11,005"; and that she also "paid the interest and premium on account of said indebtedness from the date of the first payment of dues to the date of the last payment." The receiver therefore claims a lien upon the certificate of stock, and charges that the whole sum of $900 is now due and payable, with interest from October 30, 1902, the date of the final payment. The bill prays for an accounting before a special master, and, if the sum found to be due is not paid, that the property in Augusta covered by the deed shall be sold for its satisfaction. A general and special demurrer has been filed by the defendant, the grounds of the former being: (1) want of equity; (2) vagueness, indefiniteness, and contradiction in the allegations, not properly apprising the defendant with reasonable certainty of the claim or demand; and (3) failure to allege any default in the payments at the time of filing the bill, at the death of the testatrix, or when the association went into the hands of a receiver, and also when the default occurred and the amount then due. The defendant insists that the bill on its face shows that the debt has been fully paid, and that it should therefore be dismissed as without basis for a foreclosure of the property.

As the question of jurisdiction is raised by the special demurrer, it will be disposed of before proceeding to the vital issues raised by the general demurrer. The defendant contends that, because the suit is for less than $2,000, jurisdiction cannot be taken. It is, however,

well settled by the rulings of the Supreme Court that where a court, under a proceeding in equity, assumes administration of the affairs of an insolvent corporation, and appoints a receiver, its jurisdiction is complete for all essential purposes and all parties interested. White v. Ewing, 159 U. S. 39, 15 Sup. Ct. 1018, 40 L. Ed. 67. In the case of Porter v. Sabin, 149 U. S. 473, 479, 13 Sup. Ct. 1008, 37 L. Ed. 815, where the lower court obtained original jurisdiction by the filing of a creditors' bill, and a receiver was appointed, it was held that:

"Any suit by or against such receiver, in the course of the winding up of such corporation, whether for the collection of its assets, or for the defense of its property rights, must be regarded as ancillary to the main suit, and as cognizable in the Circuit Court, regardless either of the citizenship of the parties, or of the amount in controversy."

"The jurisdiction," said the Supreme Court, "does not materially differ from that of the District Court in bankruptcy, the right of which to collect the assets of a bankrupt estate we do not understand ever to have been doubted." To the same effect are Freeman v. Howe, 24 How. 460, 16 L. Ed. 749; Alexander v. Southern Home Bldg. & Loan Ass'n (C. C.) 120 Fed. 963; Armstrong v. Trautman (C. C.) 36 Fed. 275; Price v. Abbott (C. C.) 17 Fed. 506. Since this court has assumed ancillary jurisdiction for the collection of all assets of the association found in this district, it makes no difference so long as the property is here, what the amount of the indebtedness may be.

The issue made by the general demurrer is, however, not so readily determinable. There is no more vexed question, nor one on which the courts have expressed a greater contrariety of opinion, than that which fixes the relationship of a borrowing stockholder to a building and loan association. The nature and purposes of these institutions have been defined in a recent case by the Supreme Court of Georgia, as follows:

"A private corporation designed for the purpose of accumulating into its treasury, by means of the gradual payment by its members of their stock subscriptions in periodical installments, a fund to be invested from time to time in advances made to such shareholders on their stock as may apply for this privilege on approved security; the borrowing members paying interest and a premium for this preference in securing an advancement over other members, and continuing to pay the regular installments on their stock in addition; all of which funds, together with payments made by the nonborrowing members, including fines, forfeitures, and other like revenues, go into the common fund, until it, with the profits thereon, aggregates the face value of all the shares in the association, the legal effect of which is to extinguish the liability incurred for the loans and advancements, and to distribute to each nonborrowing member the par value of his stock."

Cook v. Equitable Bldg. & Loan Ass'n, 104 Ga. 814, 30 S. E. 916. Other definitions may be found in Thompson on Bldg. & Loan Associations, § 2; Endlich on Bldg. Associations, § 16. These organizations were originated, according to the earliest authentic information, in 1815 by the Earl of Selkirk in Scotland. The experiment, which seems to have proceeded solely from the benevolent motives of the founder, was very successful and popular with the industrial classes. They were early extended to Great Britain, and existed there in the form of joint-stock companies, until Parliament in 1836 passed an act facilitating their operation. About that date we find them also in

America, where for some time they had flourished as private and unincorporated enterprises. Cotemporaneously with the act of Parliament, a regular association was organized in Brooklyn, N. Y., and their extension throughout the country was then very rapid. Unhappily, however, their real or apparent benefits began to be somewhat tainted with those evils which have aroused the severe criticism of modern economists. This appears from an opinion of Chief Justice Lumpkin, rendered in 1857, in Bibb County Loan Association v. Richards, 21 Ga. 596. There the learned Chief Justice somewhat naively declared:

"Whether they will continue to be entitled to the epithet of the 'poor man's exchequer,' and whether they will, as they promise to do, enable every man to become his own landlord, will depend entirely upon the manner in which they conduct their business. Under existing regulations, I have been led seriously to doubt this, * * * but I here dismiss these preliminary observations, leaving the utility and danger of these building and loan associations to puzzle wiser heads than mine, as they have done hitherto."

Under the allegations of the bill before the court, Mary F. Butts paid to the Southern Building & Loan Association the sum of $1,267.-50. She made no default in the payment of the installments on her shares of stock, or the interest and premiums on her loan. The association having failed in its purpose by its insolvency, the bill is filed solely to fix the relative liabilities of the complainant and the defendant in its dissolution. By the latter it is insisted that his testatrix, Mary F. Butts, is entitled to a credit of all the 94 monthly installments, aggregating the sum of $562.50, upon the principal sum of $900 borrowed. But the complainant claims that these payments, by the terms of the contract, were applicable only to the amount due on the 18 shares of stock, and that the principal sum remains unpaid, with interest from October 1, 1902, the date of the last payment. This controverted question may be briefly resolved into the inquiry, whether or not the payments of $5.40 and $6.30 each month, besides those of $3.75 each for interest and premium on the loan, operated ipso facto to extinguish the loan secured by the mortgage. In other words, did the contract of membership as a stockholder in the association, created by the testatrix's subscription to 18 shares of its stock at $50 a share, merge into her subsequent contract of loan, whereby she obtained for 5 per cent. interest and a 5 per cent. bonus or premium an advancement of the par value of her stock, and pledged that stock and her real estate for its repayment? If we can assume from the allegations of the bill, and the copies of the contracts attached, that it was the purpose of the parties that the two transactions should be identical, this ground of the demurrer must be sustained. But that this was their express intent is by no means clear from the language of the instruments. In the note, we find the words "monthly installments on said shares," and no reference whatever to clearly indicate the application of such installments to the $900 loan. The deed is conditioned on the payment of the "loan" and of "installments on said shares." It refers to the principal debt covered by the note both as a "loan upon 18 membership shares," and as "installments on said shares." We are not then at liberty to assume that the "loan" and the "installments" were

synonymous, and, not finding this in any express intention of the parties, we must look to the general doctrines which the law applies to these associations to determine whether or not such a construction is obligatory or proper. Some courts hold that the borrowing upon his shares of stock by a member is a simple loan. Other courts treat it as a dealing in partnership funds. Others construe it as an advance on the stock in process of liquidation, and others still, as a mere sale of the shares to the association. 6 Cyc. 144. From this contrariety of judicial opinion, Mr. Endlich in his recent work on the subject reaches this conclusion:

"An examination of the foregoing decisions would seem to justify the conclusion that the clear weight of judicial authority declines to look upon the transaction between a building association and its advanced member as constituting a loan pure and simple. At the same time the conflict between those decisions emphasizes the impossibility of declaring that transaction a mere dealing in partnership funds to the total exclusion of the idea of a loan. The truth can lie in neither of the extremes represented. It may perhaps be found most nearly accurate to say that the transaction is a loan, the terms of which are so vitally affected by the debtor's membership relation to the creditor society, in the source and profits of which the debtor has himself such a substantial interest, and the extent of his ultimate liability upon which is so contingent and uncertain at the time of its creation, that it is impossible to apply to it, in its essential features, the rules of common or statute law defining the limits of what may be bindingly assumed and lawfully exacted in ordinary transactions of borrowing and lending." Endlich on Building Associations, 327.

The legal effect of the insolvency of a building association is to terminate all of its contracts with its members. The object of the association is to accumulate a fund from the payments on shares, premiums, fines, and forfeitures, until it shall equal the par value of the shares subscribed by its members. When this is attained (generally within a time estimated by the association), the liability of all members for further payments ceases, and the same result occurs when the object is prematurely defeated by insolvency. 6 Cyc. 136. So far as a mortgage is given to insure the payment for stock, the obligation then is abrogated by the destruction of the stock and the society. Endlich on Bldg. Associations, 116, 118. While this is true, the member is not released from his liability to pay the balance of the sum he actually borrowed on his security, and the members must ratably contribute to the debts and losses of the association before they will be entitled to any surplus from their payments. Miles v. New South Bldg. & Loan Ass'n (C. C.) 111 Fed. 946. Upon the question of what credit shall be allowed for these payments, we find a contrariety of authority not unlike that we have discussed. The courts of last resort in the states of California, Maryland, Massachusetts, North Carolina, South Carolina, South Dakota, Utah, and Washington have held that such payments should be so credited. On the other hand, the courts of Alabama, Arkansas, Illinois, Iowa, Kansas, Missouri, Nebraska, New Jersey, Ohio, Pennsylvania, Tennessee, and Texas, and the national courts, hold that payments on stock are not ipso facto payments on the loan, and do not operate pro tanto to extinguish it. 6 Cyc. 154, 155, and cases cited. The authorities, however, preponderate to the effect that the parties must be held to the

terms of their contracts, where there appears no explicit intention to merge the indebtedness on the stock into the loan. In Manship v. New South Bldg. & Loan Ass'n (C. C.) 110 Fed. 845, Judge Niles states the principle in the following language:

"* * * The failure to recognize the dual relation which a borrowing member of a building and loan association sustains to the association as an invester in and a borrower from the same, and a further failure to recognize the rights of parties 'of full age and compos mentis' * * * to enter into contracts and be bound thereby, have been the fruitful source of the various opinions of the courts of the country, which have refused to recognize anything in the contract of a borrowing member from a building and loan association except the loan of money pure and simple. The arbitrary appropriation of premiums and stock payments to the liquidation of the debt of a borrowing member * * * in a contract which is plainly written and easily understood, in direct contravention of the undisputed terms of the contract, is unjustifiable."

Under the laws of Maryland, it was held in Coltrane v. Baltimore Bldg. & Loan Ass'n (C. C.) 110 Fed. 281, that losses of an association cannot be charged to a borrowing stockholder for contribution upon its dissolution, but he is entitled to credit on his loan the full amount paid for his stock. This decision was, however, modified on appeal by the Fourth Circuit Court of Appeals, in Coltrane v. Blake, 113 Fed. 785, 51 C. C. A. 457, where the conclusion of the learned district judge was discussed as follows:

"This conclusion confuses the obligation of two entirely distinct contracts In subscribing to the stock, the shareholder binds himself to pay the subscription, either in cash at once, or in installments, called dues. * * * Having become a stockholder, he then gets an advance from the common fund. This is another, and an entirely distinct, contract, based upon an entirely distinct consideration. * * * Payments on stock are not payments on the mortgage debt, and do not ipso facto work an extinguishment of so much of the mortgage."

The court then holds that each member, as a stockholder, "has the right to participate according to the amount of his stock in the surplus assets of the corporation on a division, and ultimately, on its dissolution, in the assets remaining after payment of its debts," and states the equitable reason of this rule, as follows:

"The capital stock of a building and loan association is composed of the subscriptions to it either by cash or by dues. If any part of these dues is diverted from the claims of creditors generally, and is used for the benefit of a single stockholder by way of credit on a debt due by him to the corporation, it is a misuse of trust funds, and so unlawful."

We have, moreover, upon this question a series of direct adjudications by the Circuit Court of Appeals for this circuit, beginning with the case of Andruss v. People's Bldg. & Loan Ass'n, 94 Fed. 575, 36 C. C. A. 336, where Judge Shelby for the court observed:

"The claim of the appellant * * * that he is entitled to credit on his bond for borrowed money, on account of the payments he made on his subscription for stock, cannot be sustained. He was a subscriber for stock in the association, and he was under contract to pay for it just as any other stockholder. Payments on the stock, his stock being forfeited under the rules of the association, cannot be applied to his debt on account of the loan."

Again, in Hieronymus v. New York Nat. Bldg. & Loan Ass'n, 107 Fed. 1005, 46 C. C. A. 684, this rule was reiterated by Judge McCor-

mick, and in the recent case of Cooper v. Brazelton, 135 Fed. 476, 68 C. C. A. 188, by a unanimous court (Judge Meek rendering the opinion) it was held:

"Appellees contend that they are entitled to credit on their bond of the amount paid by Brazelton on his stock subscription, that B. did not desire to become a bona fide shareholder in the association, and was compelled to subscribe for shares in order to secure a part of the loan or advance made on his behalf. This contention cannot be upheld. The subscription to the stock by B., and the subsequent loan or advance of money on his behalf were two separate and independent transactions, and he cannot be heard to deny the validity or effectiveness of legal contracts entered into by him. It is neither alleged nor attempted to be shown that any fraud was perpetrated upon him, as that he is non compos mentis, and therefore he must be held to a performance of his contracts. * * * "

See, also, Douglass v. Kavanaugh, 90 Fed. 373, 33 C. C. A. 107; Towle v. American Bldg. Society (C. C.) 61 Fed. 446; Tilley v. American Bldg. & Loan Ass'n (C. C.) 52 Fed. 618; Alexander v. Southern Home Bldg. & Loan Ass'n (C. C.) 120 Fed. 963; Interstate Bldg. & Loan Ass'n v. Edgefield Hotel Co. (C. C.) 120 Fed. 422; Manorita v. Fidelity Trust & Loan Co. (C. C.) 101 Fed. 8; Pattison v. Bldg. & Loan Ass'n, 63 Ga. 373; Goodrich v. City Loan Ass'n, 54 Ga. 98; City Loan Ass'n v. Goodrich, 48 Ga. 446.

By the terms of her contracts, Mary F. Butts subscribed to $900 of the stock of the Southern Building & Loan Association. This is a distinct liability. In addition, by note and deed to secure the same, she became obliged to pay her $900 loan thereon, with interest and premium. It is not contended that the payments of 5 per cent. interest, and 5 per cent. premium for the loan, were usurious, or that the insolvent corporation was not a bona fide building and loan association, nor is it claimed that the transactions alleged were the cloak for any fraud practiced upon the defendant's testatrix. In the absence of any pleading, or proof to this effect, we must hold that the defendant's testatrix was bound by her stipulations in the note and bond executed to the association, that there is no apparent intention of the parties to apply the payments of monthly installments to reduce the principal of the loan, and that by no justifiable construction can these payments be held so applicable. Even were this not true, the dependent contention of the defendant that the bill shows on its face a full satisfaction of the debt must fail. The amount of the $900 loan, borrowed on March 1, 1895, with the interest and premiums at 5 per cent. each, due to October, 1902, was $1,605. On this indebtedness the payments of monthly installments, interest, and premiums amounted to only $1,267.50. Without regard, therefore, to the questions hereinbefore discussed, there is upon the face of the bill a balance due the association, which in equitable contemplation maintains the bill. Nor is there merit in the ground of the general demurrer which sets out the failure of the complainant to allege any default in the defendant's payments. The bill shows an indebtedness by a member to the association. This being true, the gist of the bill is the insolvency and dissolution of the corporation, and the prayer for determination by an accounting before a master of the mutual rights and liabilities of the association and the member.

Other grounds of the demurrer are not deemed of consequence. For the reasons stated, both the general and special demurrers must be overruled. Orders may be taken accordingly.